**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Donald P. McMANIGAL,
Defendant-Appellant.**

No. 82–1754.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 10, 1982.

Decided May 19, 1983.

Rehearing and Rehearing En Banc Denied July 20, 1983.

Matthias A. Lydon, John A. Dienner, III, Pierce, Lydon, Griffin & Montana, Chicago, Ill., for defendant-appellant.

John Podliska, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, WOOD, Circuit Judge, and HOFFMAN, Senior District Judge.*

CUMMINGS, Chief Judge.

This is an appeal from a conviction after a jury trial for mail fraud and racketeering in violation of 18 U.S.C. §§ 1341 and 1962(c). Counts One through Fifteen of the indictment charged that from December 1974 through December 1981 defendant McManigal, a Chicago attorney, knowingly participated in a scheme to defraud Cook County and its citizens of their right to the loyal, faithful and honest services of Thomas Lavin and James Woodlock, two employees of the Cook County Board of Tax Appeals; their right to have the business of the Board conducted honestly, fairly and impartially, free from corruption, collusion, partiality, dishonesty, bribery and fraud; and their right to have real estate property taxes assessed and collected free from the influence of corruption, collusion, partiality, dishonesty, bribery and fraud. The indictment charged that pursuant to the scheme the defendant caused The Law Offices of Victor J. Cacciatore to obtain $249,250 in legal fees and that the defendant used the mails in furtherance of the scheme to defraud.

Count Sixteen alleged that The Law Offices of Victor J. Cacciatore was an "enterprise" as defined in 18 U.S.C. § 1961(4); that at all times material to the indictment defendant McManigal was associated in fact with the enterprise; and that bribery was a felony under Illinois law and that mail fraud was a crime under federal law. The indictment charged that from December 1974 through December 1981 defendant knowingly conducted and participated in the conduct of the affairs of The Law Offices of Victor J. Cacciatore through a pattern of racketeering activity by committing multiple acts of mail fraud involving the mailing of property tax bills, and by committing multiple acts of bribery involving payments of bribes to Board officials Lavin and Woodlock for the purpose of influencing them in the performance of acts related to their public employment, all in violation of 18 U.S.C. § 1962(c).

Paragraph eight of Count Sixteen sought forfeiture under 18 U.S.C. § 1963(a)(1) of McManigal's interest in the $249,250 in legal fees as an interest acquired and maintained by defendant pursuant to a pattern of racketeering activity. Paragraph nine sought forfeiture on the alternative theory under 18 U.S.C. § 1963(a)(2) that the fees were an interest in the enterprise, to wit, accounts receivable of The Law Offices of Victor J. Cacciatore.

The jury found the defendant guilty on all counts and further found that his 40% interest in the $249,250 in fees, or $99,700, was subject to forfeiture. The district court entered judgment on the verdict, sentenced defendant to eighteen months in prison to run concurrently on all counts, and ordered forfeiture of $99,700 to the United States. Defendant challenges both his conviction and the forfeiture on appeal.

I. Evidence Supporting the Conviction

The evidence presented at trial was as follows: During the period of the prosecution, from 1974 through 1981, the Cook County Board of Appeals ("Board") reviewed and decided the merits of complaints filed by Cook County taxpayers challenging their real estate property tax assessments. Each petition for review was entitled to a hearing before a hearing officer, who was authorized to recommend but not to grant an assessment reduction. After the hearing, the file would be forwarded to the Board's commissioners and deputy commissioners for review and a final decision. Seymour Zaban and Harry Semrow were the two elected commissioners of the Board during the relevant period. The con-

---

* The Honorable Walter E. Hoffman, Senior District Judge for the Eastern District of Virginia, is sitting by designation.

currence of both commissioners was required to enter an order to change the assessment. Each commissioner was assisted by appointed deputy commissioners. Until approximately January 1978 government witness Thomas Lavin was Semrow's deputy commissioner, and until the latter part of 1978 government witness Donald Erskine was Zaban's deputy commissioner. Both deputies had authority to recommend assessment reductions to the commissioners and to approve assessment reductions on certain types of smaller properties. When a deputy exercised his approval authority, he signed the initials of his commissioner on the file jacket and added his own initials to maintain a record that he had acted for his commissioner.

After a commissioner decided to reduce a particular assessment, he would enter the approximate amount of the reduction and his initials on the file jacket. It would then be sent to the Board's computer section for an exact computation of the amount of the reduction. From January 1975 through January 1980 the supervisor of the Board's computer section was government witness James Woodlock. After the computation, Woodlock would return the file to the secretary of the commissioner who had approved the reduction, and the secretary would initial the complaint form. Woodlock would then take the file to the second commissioner for his review. If the second commissioner approved, his secretary would enter his initials on the complaint form. Only the initials of the first commissioner on the file jacket were the official authorization of a reduction; the initials of both commissioners on the complaint form were merely administrative.

Before meeting defendant McManigal in this case, deputy commissioners Lavin and Erskine and computer programmer Woodlock had previously devised a scheme to grant assessment reductions fraudulently in return for payments of money and other things of value. Lavin would forge assessment reductions and forge Semrow's approval initials on Board files without adding his own initials to the Board file jacket. He would then give the forged file to Woodlock who would calculate the exact amount of reduction and take the files to Commissioner Zaban's side of the office. Instead of leaving the forged files to be reviewed by Zaban, Woodlock would add them to the stack of files which had already been reviewed and approved by Zaban and were awaiting the secretary's placing of Zaban's initials on the complaint form. Woodlock would process Lavin's forged files in return for Lavin entering forgeries on files for which Woodlock was receiving money, and Donald Erskine would cooperate in the same manner on Zaban's side of the office.

The defendant met Lavin in late 1974 during a meeting with Semrow to discuss McManigal's lack of success on complaints filed at the Board. Semrow asked Lavin to show McManigal how to put petitions together to make a more presentable case. Lavin did so and suggested that McManigal give him a list of pending cases. Lavin fraudulently processed some of those files. Until Lavin left the Board in 1978, McManigal continued to provide lists of his cases to Lavin, to take Lavin to lunch or dinner several times a year, and to give Lavin envelopes containing small denomination old bills. McManigal and Victor Cacciatore contributed to several payments to Lavin in the same proportion that they split fees. After Lavin left the Board, he continued to forge files with the assistance of other Board employees. Lavin stated that McManigal never asked him to do anything improper with his files, and never offered him a percentage-of-fee arrangement.

Erskine testified that McManigal once requested him to approve a late filing of a tax appeal petition, and that after he agreed to do so, McManigal offered him a twenty-dollar bill. Erskine refused. In addition, he testified that McManigal offered to pay him 5% of his billings if Erskine would handle all of his complaints, an offer which Erskine refused again. Erskine testified that he received $150,000 in bribes from approximately twenty practitioners during his tenure at the Board.

Woodlock was introduced to McManigal by Lavin in 1976 or 1977. In 1978, McManigal assisted Woodlock in obtaining a $7100 loan for two or three days from Victor Cacciatore. Woodlock received Christmas gifts of cash in 1978 and 1979. At one point Woodlock testified that McManigal told him of his arrangement with Lavin whereby McManigal was paying Lavin 15% of the fees that he charged. Lavin denied this arrangement. According to Woodlock, since Lavin was no longer at the Board McManigal offered to split the 15% evenly between Woodlock and Lavin. Later, in December 1979, McManigal told Woodlock that he was not paying Lavin any more and would give the full 15% to Woodlock. McManigal also gave $2500 to Woodlock in 1979 to cover construction loan interest on Woodlock's home. McManigal arranged a meeting for himself, Woodlock and Michael Andry, a longtime friend of McManigal's and one of the contractors on Woodlock's home. McManigal gave $2500 in cash to Andry, and Andry wrote a check to Woodlock for the same amount. Although loan documents and a repayment schedule were drawn up, Woodlock testified that McManigal told him later that he did not have to make payments, but should simply make notations on the repayment schedule on a regular basis showing that payments had been made.

After Woodlock agreed to cooperate with the government, he attended a meeting of McManigal and Andry wearing a concealed recorder. McManigal asked what the federal investigators wanted to know and what Woodlock told them. McManigal acknowledged giving $2500 to Woodlock, in addition to a couple of hundred two or three different times, and spending at least $2000 in one year for meals for Woodlock. McManigal stated that while he could admit to giving Woodlock money, "I won't, you know." He also urged Woodlock to deny that McManigal had any connection with Lavin. Finally, he told Woodlock that in the future he was going to have to call Woodlock a "liar or purveyor of untruths" who was "being taken advantage of" by federal prosecutors, but "you know * * *

I'm not gonna mean a thing that I say about you."

McManigal denied any knowledge of the illegal scheme at the Board. He testified that after being introduced to Lavin and Woodlock, he became close personal friends with both. As such, he occasionally took one or both of them to lunch or dinner and extended a loan to Woodlock as a friend. He testified that each year he would put together a Christmas list of people who had been particularly helpful or courteous to him during the past year and would give those people cash gifts. He denied ever promising Lavin a percentage of his fees, and he testified that he never paid him such a percentage nor ever told anyone else that he did so. He also denied ever having offered Erskine a percentage of his fees for Erskine's illegal help.

A. *Use of Mails*

■ On this appeal, defendant first argues that the use of the mails in this case was not for the purpose of executing the scheme, requiring reversal of the convictions for mail fraud and racketeering. Because the purported scheme was only the supposed illegal reduction in assessed valuation, he argues, the fraud was completed when the valuations were entered on the books of the Board. The mailings of the fraudulent real estate property tax bills were therefore "total surplusage" taking place well after the alleged fraud occurred (Br. 44). In addition, Illinois law mandates that the failure of the collector to mail the bill, or the failure of the taxpayer to receive it, does not affect the liability of the taxpayer to pay it. According to defendant, the use of the mails therefore could not have been in execution of any fraudulent assessment scheme.

The defendant characterizes too narrowly the scheme charged in the indictment and supported by the evidence at trial. The indictment clearly charged a scheme to defraud Cook County citizens of their right to have real estate property taxes assessed and *collected* free from corruption, collusion, partiality, dishonesty, bribery and

fraud (Count 1, ¶ 4c). It further alleged that defendant McManigal received fees and caused The Law Offices of Victor Cacciatore to receive fees from clients that were a percentage of the real estate tax savings which those property owners obtained as a result of the assessment reductions (Count 1, ¶ 8). Finally, it alleged that defendant knowingly caused real estate property tax bills to be mailed to a series of clients in furtherance of his scheme to defraud (Count 1, ¶ 10). The evidence at trial showed that assessment reductions which McManigal obtained normally remained in effect for four years, and his fee, which was one-fourth of each year's tax savings, was due each year after the taxpayer received his tax bill in the mail. The mailings of what should have been legitimately determined tax bills were used by defendant both to advise the property owner of the amount of tax savings from the fraudulent reduction and to precipitate payment of McManigal's fee. As in *United States v. Feinberg,* 535 F.2d 1004, 1009 (7th Cir.1976), certiorari denied, 429 U.S. 929, 97 S.Ct. 337, 50 L.Ed.2d 300,[1] where this court rejected defendant's argument that the mailings of the tax bills were made after completion of a scheme to defraud,

> [t]he end result of the scheme to defraud was the ultimate obtaining through the mails of a statement of an amount of taxes payable in an amount less than the amount that would have been due but for the successful operation of the scheme and the mailings Feinberg caused to be done in the furtherance of the scheme.

Thus we find that the mails were used to carry out the scheme to defraud.

■ Defendant's argument that the mailing was not an "essential element" of the scheme because Illinois law makes tax liability separate from the mailing or receipt of the tax bill does not change the result. Ill.Rev.Stat., ch. 120, § 671 (1981). To use the mails in furtherance of a scheme requires only that a defendant commit an act with knowledge that the use of the mails will follow in the ordinary course of business, or commit an act when the use of the mails can reasonably be foreseen. *United States v. Stanford,* 589 F.2d 285, 295 (7th Cir.1978), certiorari denied, 440 U.S. 983, 99 S.Ct. 1794, 60 L.Ed.2d 244. The jury instruction in this case, which was given without objection and is not challenged on this appeal, explicitly stated that "proof of mail fraud does not require that a defendant contemplate the use of the mails in furtherance of the scheme * * *. It is sufficient to establish this element of the crime if the mails were in fact used to carry out the scheme, and * * * the use of the mails was reasonably foreseeable." The presence of the Illinois statute cannot change the fact that the use of the mails was reasonably foreseeable.

Finally, we reject defendant's argument that *Parr v. United States,* 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 governs this case. In *Parr,* the government alleged that a scheme existed to "pad" tax assessments in order to raise excess monies for the personal benefit of the defendants. The government argued that the assessment valuation notices were for the purpose of executing the scheme. The Supreme Court held this mailing insufficient for purposes of the mail fraud statute, specifically in light of the fact "that the indictment did not expressly or impliedly charge, and there was no evidence tending to show, that the taxes assessed were excessive, 'padded' or in any way illegal." *Id.* at 387, 80 S.Ct. at 1181. In this case, the evidence established that McManigal obtained assessment reductions and resulting property tax reductions by bribery and fraud. This caused the tax bill for a particular piece of property to be smaller than it otherwise would have been. There was also evidence that certain files

1. We reject defendant's argument that *Feinberg, supra,* should be distinguished because the indictment in that case charged a fraudulent scheme to obtain a "reduced tax bill." 535 F.2d at 1009. Despite the absence of identical language in the present indictment, it adequately charged and the evidence presented at trial adequately proved that the purpose of the scheme was to obtain reduced real estate property tax assessments fraudulently and to receive fees for such accomplishments.

which had gone through the legitimate processes of the Board and had been set aside to be stamped "no change" were later changed to permit assessment reductions. The proof in this case did show that the amount of taxes assessed and collected was determined by unlawful means, thus distinguishing *Parr, supra.* We therefore find that the mails were used for the purpose of executing the scheme.[2]

## B. *Bribery Intent*

Second, the defendant argues that the government failed to prove that the defendant committed any acts of bribery under state law. Specifically, he points to the absence of proof that the defendant gave the various gifts to Board employees with the intent to influence them in the performance of their official duties. Because we uphold the mail fraud conviction, *supra,* and because each count of the mail fraud conviction constitutes a separate offense, *United States v. Weatherspoon,* 581 F.2d 595, 602 (7th Cir.1978), the mail fraud counts alone are sufficient predicate offenses to constitute a "pattern of racketeering activity" under 18 U.S.C. § 1962(c). We thus discuss the sufficiency of the evidence of bribery only briefly.

 A defendant's intent, as defendant admits (Br. 51), may be inferred from all the facts and circumstances proved at trial. The evidence showed that from December 1974 to December 1977 McManigal paid Lavin several hundred dollars several times a year, knowing that Lavin was a deputy commissioner at the Board. After Lavin left the Board, McManigal made payments to Woodlock, arranged a $7100 loan, and paid at least $2000 for meals for Woodlock until he left the Board. Although McManigal testified that those payments were gifts to friends, there was evidence that for some of the payments, McManigal and Victor Cacciatore contributed to the payment in the same proportion that they split legal fees. There was testimony that McManigal offered Board personnel a percentage of his fees in return for assistance in obtaining assessment reductions. There was also evi-

dence of a recorded conversation in which McManigal attempted to convince Woodlock to lie to federal investigators and in general to deny his relationship with McManigal. Defendant stresses, of course, that there was also testimony favorable to McManigal, and he emphasizes that the government never asked its witnesses why they were fraudulently processing the defendant's files. Defendant argues that we must presume that this was because the government knew the bribe recipients were not illegally processing files in exchange for the gifts given by defendant, but for some other reason. We agree with the government that the focus of the bribery charge is on defendant's intent in making the payment, rather than the Board employees' intent in illegally processing the files. There is bribery when the offer is made with intent that the offeree act favorably to the offeror even when no particular act is contemplated by the offeror or offeree. *United States v. Isaacs,* 493 F.2d 1124, 1145 (7th Cir.1974), certiorari denied, 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146. Viewing the evidence in the light most favorable to the government, we think it was sufficient to convince a jury beyond a reasonable doubt that McManigal intended to bribe Board officials.

## C. *Government's Closing Argument*

 Third, defendant argues that the government's inflammatory and prejudicial remarks in closing argument deprived him of a fair trial. In particular, defendant points to the prosecutor's statements to the jury about widespread corruption in the City of Chicago, and his advice that to convict the defendant would be "your chance to show your outrage at the sort of things that you have been hearing about for years, and you heard about here" (Tr. 581–583). When defendant objected, the court instructed the jury, *id.,* that their role was to "determine the guilt or innocence of Donald McManigal on the charges that have been brought against him." In addition,

---

2. The defendant does not challenge the suffi- ciency of the evidence on the mail fraud counts.

defendant complains of the government's statement to the jury that the defendant was guilty of "wining and dining" public officials (Tr. 567).

With respect to the latter complaint, we agree with the government that use of the term "wining and dining" was appropriate in light of the fact that the defense used the term in its opening statement (Tr. 18–19). With respect to the former complaint, while we do not condone the choice of words by the prosecutor, it does not justify reversal. Defendant notes a mere four or five paragraphs in a case in which the government's closing argument and rebuttal extends over 40 pages. The trial judge's cautionary comments to the jury cured any harm the prosecutor's remarks may have caused.

### D. Interstate Commerce

■ Defendant's final, three-sentence argument is that there was no evidence to show that the enterprise, The Law Offices of Victor J. Cacciatore, affected interstate commerce (Br. 40). The assessment reductions obtained by McManigal for two clients who do interstate business as well as their payment of his attorney's fees both actually and potentially altered the funds available to those clients to purchase goods and services in interstate commerce. This is sufficient to show that the enterprise affects interstate commerce. See *United States v. Barton,* 647 F.2d 224, 233–234 (2d Cir.1981), certiorari denied, 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152; *United States v. Nerone,* 563 F.2d 836, 850–851 (7th Cir.1977), certiorari denied, 435 U.S. 951, 98 S.Ct. 1577, 55 L.Ed.2d 800.[3]

The conviction is affirmed.

### II. Forfeiture Ruling

Defendant appeals from the district court's order requiring forfeiture of $99,700 to the Attorney General of the United States. Count Sixteen of the indictment requested forfeiture under two alternative theories. First, the government demanded that defendant forfeit his "interest in approximately $249,250 in legal fees paid and owed to the law office of Victor J. Cacciatore as a result of the fraudulent processing of approximately 280 cases" (Count 16, ¶ 8). The government argues that these fees were proceeds of McManigal's racketeering activity and that the term "any interest" in Section 1963(a)(1) includes proceeds. In the alternative, the government demanded forfeiture of defendant's "interests in, securities of, claims against, and property and contractual rights [affording] him a source of influence over, the Law Offices of Victor J. Cacciatore" (Count 16, ¶ 9). The government argues that McManigal's billing invoices to his clients seeking payment of fees became accounts receivable, an asset of The Law Offices of Victor J. Cacciatore, and therefore an interest in the enterprise under Section 1963(a)(2).

### A. Section 1963(a)(1): the meaning of "interest"

■ The arguments for and against including proceeds in Section 1963(a)(1) have been exhaustively explored by the Ninth Circuit in *United States v. Marubeni America Corp.,* 611 F.2d 763 (9th Cir.1980), holding that proceeds are not included, and the Fifth Circuit, in *United States v. Martino,* 681 F.2d 952 (5th Cir.1982) (en banc), certiorari granted *sub nom. Russello v. United States,* —— U.S. ——, 103 S.Ct. 721, 74 L.Ed.2d 948 (1983), holding that proceeds are included. See also *United States v. Romano,* 523 F.Supp. 1209 (S.D.Fla.1981). After examining the language and legislative history of the statute, we conclude that the Ninth Circuit is correct.

---

**3.** Defendant also notes, quite briefly, that the government presented its case so as to appeal to the jurors' self-interest as taxpayers, thus requiring reversal when viewed in combination with the errors discussed above. But according to the transcript, it was the defendant who elicited on cross-examination of Commissioner Zaban that regardless of the Board's assessment valuation for a particular piece of property, the County collects the same amount of total dollars (Tr. 81). We agree with the government that it was the cross-examination that made it possible for a juror to infer that a fraudulently reduced tax bill on one parcel would lead to an increased tax rate to collect more from the taxpayers whose assessments were legitimate.

RICO contains a prohibitory section, 18 U.S.C. § 1962, and a penal section, *id.* § 1963. Section 1962 prohibits three types of activities: (1) acquiring an interest in, establishing or operating an "enterprise" with income derived from a "pattern of racketeering activity;" (2) acquiring an interest in or control of an "enterprise" through a "pattern of racketeering activity;" (3) conducting or participating in the conduct of an "enterprise" through a "pattern of racketeering activity." [4] Section 1963 provides that whoever violates Section 1962

> shall be fined not more than $25,000 or imprisoned not more than twenty years, or both, and shall forfeit to the United States (1) any interest he has acquired or maintained in violation of section 1962, and (2) any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which he has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962.

On its face, Section 1963(a)(2) expressly limits forfeitable interests to those in an enterprise, but Section 1963(a)(1) speaks only of "any interest," a distinction relied on by the Fifth Circuit in *Martino, supra,* 681 F.2d at 954. However, no definition of the term "interest" appears in the statute. Were we to turn to one of the dictionaries used by the Fifth Circuit in *Martino, id.,* we would find that "interest" has been defined as "[t]he most general term that can be employed to denote a right, claim, title, or legal share *in something,*" Black's Law Dictionary 729 (5th ed. 1979) (emphasis supplied), indicating that an "interest" is a part of a larger whole. *United States v. Thevis,* 474 F.Supp. 134, 141–142 (N.D.Ga.1979). The words "interest," "income" and "proceeds" are all used in Section 1962(a), thus indicating that Congress did not intend them to have the same meaning, and that Congress knew how to use the term "income" or "proceeds" when that was what it meant. This is further evidenced by the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 848(a)(2)(A), passed by the same Congress in the same month as RICO, in which Congress provided for forfeiture of "profits" obtained from a criminal enterprise.

It is not really possible to determine the meaning of the word "interest" simply from reading Section 1963. *Contra Martino, supra,* 681 F.2d at 954–956 and n. 16. An examination of the substantive provisions in Section 1962 supports a narrow reading of the term "interest." Section 1962(a), for example, makes it illegal only to invest income derived from a pattern of racketeering activity. Though Congress obviously recognized that income and profits could be

---

4. 18 U.S.C. § 1962 provides:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which effect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern of racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

generated by a pattern of racketeering activity, it chose to criminalize only the investment of that income, except under the 1% investment exception, when the total investment is de minimis and thus would not grant the racketeer control over the business. The earning of illegal income itself is not prohibited under RICO. Rather the entire statutory scheme is based on the "enterprise" concept, and it is that concept which distinguishes a RICO prosecution from any other prosecution. Although the Fifth Circuit is technically correct when it says that the enterprise concept applies to a RICO prosecution under Section 1962, and not necessarily to the forfeiture provisions of Section 1963, *Martino, supra,* 681 F.2d at 955 and n. 15, it makes sense in construing the scope of the statute to read the prohibitory and penal sections in a similar way. Thus the relevant "interest" under Section 1963 would be only an interest in an enterprise, more "akin to a continuing proprietary right in the nature of partnership or stock ownership (or holding a debt or claim, as distinguished from 'equity' investment) * * * than [to] mere dividends or distributed profits." *United States v. Meyers,* 432 F.Supp. 456, 461 (W.D.Pa.1977) (footnote omitted).

The legislative history of RICO also supports this view. According to the Congressional Statement of Findings and Purpose, RICO was intended to relieve an economic burden on the nation caused by the use of money and power by organized crime to infiltrate businesses and organizations:

(1) organized crime in the United States is a highly sophisticated, diversified, and widespread activity that annually drains billions of dollars from America's economy by unlawful conduct and the illegal use of force, fraud and corruption; (2) organized crime derives a major portion of its power through money obtained from such illegal endeavors as syndicated gambling, loan sharking, the theft and fencing of property, the importation and distribution of narcotics and other dangerous drugs, and other forms of social exploitation; (3) *this money and power are increasingly used to infiltrate and corrupt legitimate business and labor unions and to subvert and corrupt our democratic processes;* (4) organized crime activities in the United States weaken the stability of the Nation's economic system, harm innocent investors and competing organizations, interfere with free competition, seriously burden interstate and foreign commerce, threaten the domestic security, and undermine the general welfare of the Nation and its citizens * * *.

Organized Crime Control Act of 1970, Pub.L. No. 91–452, 84 Stat. 922–923 (1970) (emphasis supplied). The Senate Report describes the remedies envisioned to combat this infiltration:

Where an organization is acquired or run by defined racketeering methods, then the persons involved can be legally separated from the organization, either by the criminal law approach of fine, imprisonment and forfeiture, or through a civil law approach of equitable relief broad enough to do all that is necessary to free the channels of commerce from all illicit activity.

S.Rep. No. 91–617, 91st Cong., 1st Sess. 79 (1969). The new remedies would make it possible to "remove the leaders of organized crime from their sources of economic power. Instead of their positions being filled by successors no different in kind, the channels of commerce can be freed of racketeering influence." *Id.* at 80.

This emphasis on separating the criminal from the organization and therefore sanitizing the enterprise supports the view that Congress intended the forfeiture provision to apply only to an interest in the enterprise. *Marubeni, supra,* 611 F.2d at 769; *United States v. Thevis, supra,* 474 F.Supp. at 143. See also Taylor, *Forfeiture under 18 U.S.C. § 1963–RICO's Most Powerful Weapon,* 17 Am.Crim.L.Rev. 379 (1980). So too does a letter from the Justice Department approving the forfeiture provision of RICO, "limited as it is in Section 1963(a) to one's *interest in the enterprise* which is the subject of the specific offense involved here, and not extending to any other property of the convicted offender." *Measures*

Relating to Organized Crime, Hearings before the Subcomm. on Criminal Laws and Procedures of the Senate Comm. on the Judiciary, 91st Cong., 1st Sess. 407 (emphasis supplied). Although the letter was originally submitted as a commentary on a prior draft of RICO which contained a unitary forfeiture provision with an express enterprise limitation, the Senate Report expressly refers to and quotes the Justice Department letter as "aptly explain[ing]" the criminal forfeiture provision of Section 1963(a) as enacted. S.Rep. No. 91–617, *supra* at 79–80. See *Marubeni, supra,* 611 F.2d at 767–768; *Martino, supra,* 681 F.2d at 963–964 (Politz, J., joined by six others, dissenting). Both the Senate and House Reports explain the forfeiture provision in terms of interests in an enterprise. See S.Rep. No. 91–617, *supra* at 160 ("The language [of Section 1963(a)] is designed to accomplish a forfeiture of any 'interest' of any type in the enterprise"); H.Rep. No. 91–1549, 91st Cong., 1st Sess., *reprinted in* 1970 U.S.Code Cong. & Ad.News 4007, 4010 ("provision is made for the criminal forfeiture of the convicted person's interest in the enterprise").[5]

Finally, it should be remembered that "historically our society has abhorred forfeitures." *Martino, supra,* 681 F.2d at 962 (dissent). Aside from *in rem* forfeiture proceedings, the forfeiture of a portion of a person's property as a consequence of a criminal conviction was unknown to the federal criminal law until the passage of Section 1963. *United States v. Rubin,* 559 F.2d 975, 991 (5th Cir.1977), vacated and remanded on other grounds, 439 U.S. 810. Congress recognized that it was to some extent reviving a penalty that had not been in use since the First Congress, by Act of April 20, 1790, abolished forfeiture of estate

and corruption of blood. See 18 U.S.C. § 3563. According to the Justice Department letter incorporated in the Senate Report, *supra* at 80, "From [1790] to the present, therefore, no Federal statute has provided for a penalty of forfeiture as a punishment for violation of a criminal statute of the United States." In light of this history, it is necessary to proceed cautiously in construing the forfeiture provisions of RICO. Accord, *United States v. Rubin, supra,* 559 F.2d at 991; *United States v. Thevis, supra,* 474 F.Supp. at 142.

The statute can be reasonably construed in accordance with a narrow reading of the forfeiture provision to exclude proceeds. As discussed by the Ninth Circuit in *Marubeni, supra,* and the dissent in *Martino, supra,* the forfeiture sanctions in Sections 1963(a)(1) and (a)(2) were meant to apply to different types of illegal behavior under Section 1962. Section 1963(a)(1) requires forfeiture of any interest defendant "has acquired or maintained in violation of section 1962." Yet one cannot "acquire" or "maintain" an interest "in violation of section 1962" except by violating Section 1962(a) or (b). In this sense, Section 1963(a)(1) *does* tie forfeiture to violations only of Sections 1962(a) and (b). *Contra Martino, supra,* 681 F.2d at 955. Thus the forfeiture sanction in Section 1963(a)(1) is meant to apply to interests in a business acquired with tainted money under Section 1962(a), and to interests in an enterprise acquired or maintained by racketeering activity under Section 1962(b). The forfeiture sanction in Section 1963(a)(2) is meant to apply to interests in an enterprise which is involved in conduct violative of Section 1962(c), as well as conduct violative of Section 1962(a) that does not involve "acquiring" or "maintaining" an interest in an

---

5. We agree with the Ninth Circuit, 611 F.2d at 768 n. 10, that

isolated references [to forfeiture of all "illgotten gains"] are simply rhetorical approximations and must be put in perspective. As Senator McClellan, the principal sponsor of the bill stated:

The concept of criminal forfeiture is an old one in our common law. It was extensively used in England and had some limited use in the Colonies. Title IX, drawing on this early history, would forfeit the illgotten gains of criminals *where they enter or operate an organization* through a pattern of racketeering activity.

116 Cong.Rec. 591–92 (1969) (emphasis added).

For an opposing view, see Weiner, *Crime Must Not Pay: RICO Criminal Forfeiture in Perspective,* 1981 N.Ill.U.L.Rev. 225.

enterprise. See Tarlow, *RICO Revisited,* 17 Ga.L.Rev. 291, 307–308 (1983).

This reading of the statute does not render Section 1963(a)(1) mere "surplusage." *Martino, supra,* 681 F.2d at 955–956. For example, if a defendant violates Section 1962(a) by using income from racketeering activity to purchase over 1% of the stock of an enterprise but the investment is totally passive,

> no element of control or influence envisioned by § 1963(a)(2) is involved. This interest would not be forfeitable under § 1963(a)(2), but it would be forfeitable under § 1963(a)(1) since the acquisition violates § 1962(a). The recognition of an enterprise limitation in § 1963(a)(1) does not, therefore, render that section surplusage.

*Id.* at 963 (dissent). In addition, the fact that in some RICO prosecutions there may be no forfeitable property other than the ill-gotten proceeds should not change this interpretation. See *Martino, supra,* 681 F.2d at 958. The Justice Department itself recognized that "there is often nothing to forfeit * * * in the case of individuals associated in fact * * *." United States Department of Justice, Explanation of the Racketeer Influenced and Corrupt Organization Statute 2 (4th ed.), quoted in Taylor, *supra,* 17 Am.Crim.L.Rev. at 391. Cf. *United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (RICO applies to both legitimate and illegitimate enterprises).

In sum, pending a contrary interpretation by the Supreme Court, we will follow the Ninth Circuit in holding that the term "interest" in Section 1963(a)(1) does not include the income, proceeds or profits derived from a pattern of racketeering activity. The government may not recover McManigal's legal fees under Section 1963(a)(1).

B. *Section 1963(a)(2): the relation-back doctrine*

■ Under the government's alternative forfeiture theory, the proceeds of McManigal's activity are recoverable as accounts receivable, an interest in, claim against, or property or contractual right affording him a source of influence over the enterprise. An interest in accounts receivable, however, may vanish once the accounts are paid up. To avoid this result, the government argues that its interest in the accounts receivable "relates back" to the time of the offense. See *United States v. Stowell,* 133 U.S. 1, 16–17, 10 S.Ct. 244, 247, 33 L.Ed. 555. Thus the government argues that it stood in the shoes of the defendant when he collected his fees, and is now entitled either to those particular fees in whatever form they have taken since the offense, or to the monetary equivalent of the fees. Defendant argues in response that the relation-back doctrine of *Stowell, supra,* applies only in statutory *in rem* forfeiture proceedings, and was not meant to apply in a RICO forfeiture.

To resolve the problem it is necessary to decide what Congress intended when it revived the long-dormant notion of *in personam* forfeiture in RICO. Forfeitures *in personam,* or forfeiture of estate as punishment for crime, arose in medieval England. It was based on the theory that breach of the common law, an offense to the King's peace, should deprive the transgressor of the right to own property. Under English common law, criminal forfeiture was merely an added penalty imposed *in personam* against a defendant convicted of a felony. Various rules and procedures applied to common law forfeiture of personal and real property. The forfeiture of personalty did not date back to the time of the offense; forfeiture of realty did. Weiner, *Crime Must Not Pay: RICO Criminal Forfeiture in Perspective,* 1981 N.Ill.U.L.Rev. 225, 229–230, quoting 4 *W. Blackstone, Commentaries* *354.

In the United States, *in personam* criminal forfeiture was not extensively used. The United States Constitution significantly narrowed the reach of *in personam* forfeiture by providing that "no Attainder of Treason shall work Corruption of Blood, or Forfeiture except during the Life of the Person attainted." U.S.Const., art. III, § 3, cl. 2. In 1790, Congress abolished forfeiture of estate and corruption of blood upon con-

viction, 1 Stat. 117, ch. 9, § 24 (codified at 18 U.S.C. § 3563). *In rem* statutory forfeitures, taken directly against the offending goods, however, were used extensively in the United States, as in the customs, narcotics and revenue laws. These proceedings were considered civil proceedings, because the "personification" of the property made the "guilt" of the property independent of the innocence or guilt of the owner. See Note, *Bane of American Forfeiture Law-Banished at Last?* 62 Cornell L.Rev. 768, 790–792 (1977). Thus when the courts in the United States considered forfeitures, they had before them almost exclusively statutory *in rem* forfeiture proceedings. Though the old rule in the United States used to be that "in the absence of any express terms in the statute declaring an instantaneous forfeiture, the forfeiture relates to the time of seizure only," *United States v. 396 Barrels Distilled Spirits,* 28 F.Cas. 121, 125 (E.D.Mo.1866) *quoted in* Note, *supra* at 780, the more modern rule apparently is relation back in time. See Note, *supra.* Both rules were developed, however, by courts interpreting statutory *in rem* forfeitures. See *United States v. Stowell,* 133 U.S. 1, 10 S.Ct. 244, 33 L.Ed. 555; *Various Items of Personal Property v. United States,* 282 U.S. 577, 51 S.Ct. 282, 75 L.Ed. 558.

When Congress enacted RICO in 1970, it thought it was providing for the first use of criminal *in personam* forfeiture since 1790. Note, *supra* at 794–795. The Senate Report, *supra* at 79–80, incorporated the Justice Department comments on the proposed statute, explicitly distinguishing the type of *in rem* forfeiture that had been in use from the *in personam* forfeiture enacted in RICO:

> The concept of forfeiture as a criminal penalty which is embodied in this provision differs from other presently existing forfeiture provisions under Federal statutes where the proceeding is *in rem* against the property and the thing which is declared unlawful under the statute, or which is used for an unlawful purpose, or in connection with the prohibited property or transaction, is considered the of-

fender, and the forfeiture is no part of the punishment for the criminal offense.

\* \* \* \* \* \*

> Under the criminal forfeiture of section 1963, however, the proceeding is *in personam* against the defendant who is the party to be punished upon conviction of violation of any provision of the section, not only by fine and/or imprisonment, but also by forfeiture of all interest in the enterprise.

\* \* \* \* \* \*

> While there is some indication that this concept of criminal forfeiture was in usage in the colonies, the First Congress by Act of April 20, 1790, abolished forfeiture of estate and corruption of blood, including in cases of treason. \* \* \* From that date to the present, therefore, no Federal statute has provided for a penalty of forfeiture as a punishment for violation of a criminal statute of the United States. Section 1963(a), therefore, would repeal 18 U.S.C. § 3563 by implication.

In short, Congress envisioned a whole new remedial approach, unlike the *in rem* forfeiture proceedings of the past. See *United States v. Veon,* 538 F.Supp. 237, 242 (E.D. Cal.1982). Cf. *United States v. Huber,* 603 F.2d 387, 396 (2d Cir.1979) (RICCO is innovative in that it imposes forfeiture directly on individual as part of a criminal prosecution rather than in a separate proceeding *in rem* against the property), certiorari denied, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 758.

Although Congress clearly accepted the Justice Department view that *in personam* forfeiture was a "revived" remedy, it is unlikely that Congress was aware of the old interpretive rules or intended them to apply. If indeed, under the common law of England, realty was forfeited to the King on the date of the offense, but personalty was not forfeited until the date of the conviction, perhaps, according to Blackstone, because of the "inconvenience" of locating chattels, 2 *W. Blackstone, Commentaries* \*421, *quoted in* Note, *supra* at 773 n. 37, we would be faced with the task of deciding whether accounts receivable

were more akin to realty or personalty. It is more useful to examine the purposes behind RICO in order to decide whether Congress intended the forfeiture to relate back.

As discussed above, *supra* Part II–A, Congress clearly intended the forfeiture provision to serve as a means of sanitizing the enterprise, separating the racketeer permanently from the business he corrupted. In this sense, the statute is "remedial." However, if Congress had had only remedial purposes in mind, it would have permitted the defendant to sell his interest himself and keep the profits rather than requiring him to forfeit his interest to the government. By requiring forfeiture rather than sale, Congress indicated that the forfeiture provision should serve a punitive as well as a remedial purpose.

If a racketeer voluntarily divests himself of his interest in an enterprise before conviction or indictment, 18 U.S.C. § 1963(b),[6] the remedial purpose of the statute is served. Thus, the relation-back doctrine can serve only a punitive purpose. If the statute is interpreted to follow the interest into the hands of an innocent purchaser, the relation-back doctrine will have no impact on the racketeer. If the statute is interpreted to allow recovery of the form the interest has taken in the hands of the racketeer, for example, the proceeds the racketeer received when he sold the interest to an innocent purchaser, it would run afoul of our interpretation of "interest" explained in Part II–A, *supra*. See *Marubeni, supra*, 611 F.2d at 769 n. 11 (no " 'loophole' would be created if racketeers were allowed to divest themselves of interests in an enterprise and

thereby avoid forfeiture. Divestiture is not exploitation of a 'loophole' ").[7] This interpretation would also defeat Congressional intent to revive *in personam* forfeiture only in a limited way, "limited as it is * * * to one's interest in the enterprise * * * and not extending to any other property of the convicted offender." S.Rep. No. 91–617, *supra* at 80. If however the government's interest in the property attaches on conviction or indictment, both purposes of the statute are served. Forfeiture at that time both separates the racketeer from the enterprise and punishes him by preventing him from recovering the value of his interest. See Taylor, *supra* at 388. See also *United States v. Weatherspoon,* 581 F.2d 595, 602 (7th Cir.1978) (government's motion to strike portion of the indictment correctly granted because the government "had not offered any evidence to show that [defendant] owned all the assets of the beauty college, which therefore would have subjected the assets to forfeiture under 18 U.S.C. § 1963"); *United States v. Meyers,* 432 F.Supp. 456, 461 (W.D.Pa.1977) (fact that government did not describe the forfeitable property interest in the indictment does not invalidate it in light of government contention that "there no longer was in existence any forfeitable interest at the date of the indictment. Under that assumption, conviction could not 'result' in forfeiture, whether or not the Government sought it * * *.") (footnote omitted). Cf. *United States v. Veon,* 549 F.Supp. 274 (E.D.Cal.1982) (under 21 U.S.C. § 848(d) government has no legal or equitable interest in property subject to forfeiture unless and until guilt of accused is established).

---

6. Section 1963(b) allows the district court to issue restraining orders "in connection with any property or other interest subject to forfeiture." Both parties attempt to use this provision to their advantage. Defendant argues that Congress meant the government's interest to attach on indictment, because it was at that point that the government could move to restrain disposition of the property. The United States argues that Congress merely intended to make it easier to keep track of the property after indictment by allowing for restraining orders; Section 1963(b) does not, however, indicate that the government's interest could not attach earlier. Neither argument is conclusive.

We interpret the government's right to the property to attach on conviction; or, if the government can meet its burden of showing a high enough likelihood of conviction to get a restraining order, then on indictment. See *United States v. Veon,* 538 F.Supp. 237 (E.D. Cal.1982); *United States v. Mandel,* 408 F.Supp. 679, 682–684 (D.Md.1976). Cf. *United States v. Long,* 654 F.2d 911, 915 (3d Cir.1981) (21 U.S.C. § 848(d)).

7. Of course the government should be given the opportunity to show that the transfer was not to an innocent purchaser.

Rejection of the relation-back doctrine in RICO forfeiture cases best serves Congress's remedial and punitive purposes. A defendant cannot be made to forfeit an interest he no longer possesses on conviction or indictment, either because he has voluntarily divested himself of the interest or because the interest has disappeared. Because the government did not obtain a restraining order at the time of indictment in this case, it can only recover whatever accounts receivable were still in existence at the time of conviction. The government cannot recover defendant's 40% interest in legal fees paid him before conviction under Section 1963(a)(2).

The order forfeiting $99,700, the equivalent of defendant's 40% interest in attorney's fees from the accounts of The Law Offices of Victor J. Cacciatore, is reversed, whereas, as previously noted, the conviction is affirmed.

Cudahy, Circuit Judge, filed dissenting opinion.