**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Stephen T. GORNY,**
**Defendant-Appellant.**

**No. 83–2118.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 16, 1984.

Decided April 20, 1984.

Rehearing and Rehearing En Banc
Denied June 12, 1984.

Patrick A. Tuite, Law Office of P.A. Tuite, Chicago, Ill., for defendant-appellant.

Scott Turow, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before BAUER and CUDAHY, Circuit Judges, and BEATTY, District Judge.*

CUDAHY, Circuit Judge.

The defendant, a former Deputy Commissioner of the Cook County Board of (Tax) Appeals, was found guilty following

* Honorable William L. Beatty, District Judge for the Southern District of Illinois, is sitting by designation.

a jury trial of mail fraud in violation of 18 U.S.C. § 1341 (1982), racketeering in violation of 18 U.S.C. § 1962(c) (1982) ("RICO") and obstruction of a federal criminal investigation in violation of 18 U.S.C. § 1510 (1982). We affirm the conviction on all counts.

I

The defendant, Stephen T. Gorny, served as a Deputy Commissioner of the Cook County Board of (Tax) Appeals ("the Board") from May 1, 1978 to June 3, 1982. The Board is an agency of Cook County empowered to receive, hear and review complaints relating to real estate property tax assessments.[1] One of the two elected commissioners of the Board or one of their deputies would review a complaint challenging a property tax assessment. If the first reviewing official determined that an assessment was correct, the file received no further treatment. If the first official determined to lower the assessment, a new figure was entered on the file, and then the other commissioner or a deputy reviewed the file, although the second review was often *pro forma*. There are virtually no criteria specified in Illinois law to be applied in determining a real estate assessment, and thus each commissioner and deputy enjoyed broad discretion in deciding the merits of individual cases. When a real estate tax assessment reduction was granted, the lowered assessment was reflected on the second installment of the taxpayer's real estate bill.

During the approximately four years that Gorny served as a deputy commissioner on the Board, he received several payments in cash and other personal advantages, primarily through his outside law practice which he was permitted to maintain, from attorneys who practiced before the Board. At trial, the government presented testimony from several practitioners who had given cash or other benefits to Gorny and some of whom had previously been indicted, pled guilty and so were cooperating with the government.

This testimony revealed that, unlike some of Gorny's predecessors, Gorny did not receive payments based on the outcome of any specific case nor was the amount he received based on a percentage of the reduction of an assessment. *See United States v. McManigal,* 708 F.2d 276, 278–80 (7th Cir.), *vacated on other grounds,* —— U.S. ——, 104 S.Ct. 419, 78 L.Ed.2d 355 *reaffirmed on other grounds,* 723 F.2d 580 (7th Cir.1983) *("McManigal ").* Nevertheless, two attorneys (Jay Witt and Marshall Fleischman) who had practiced before the Board testified that they each gave Gorny approximately $2,000 in cash over the period of Gorny's employment at the Board so that he would deal favorably with their files (Tr. 253–69, 1077–83). An appraiser, Lawrence Starkman, who was a partner in a real estate partnership with several Board practitioners, testified that their partnership employed Gorny to help with a real estate tax assessment case in Kane County. Gorny, who was permitted to handle real estate tax matters outside of Cook County, received a fee of $1,085 for little more than a phone call and despite the fact that the tax reduction actually granted was less than the figure which had previously been used to calculate Gorny's fee (Tr. 864–68, 904–06). Finally, Gorny received $4,000 in cash from Robert Berger, the president of a tax consulting group, ostensibly as a referral fee, while, in fact, Gorny had not made any referral (Tr. 378–403).

Not only did Gorny receive approximately $9,000, mostly in cash payments, during his approximately four years of employment at the Board, but these funds were received under somewhat suspicious circumstances. The payment from Starkman was received in the form of a personal check which was blank as to the amount. Gorny's friend, Zachary Stanger, who will be discussed below, ultimately came to fill in the amount (Tr. 868–98). Witt gave four

---

1. For a fuller discussion of the Board's practices and procedures, *see United States v. McManigal,* 708 F.2d 276, 278–80 (7th Cir.), *vacated on other grounds,* —— U.S. ——, 104 S.Ct. 419, 78 L.Ed.2d 355 *reaffirmed on other grounds,* 723 F.2d 580 (7th Cir.1983).

payments of $500 each to Gorny and, on at least one occasion, passed the cash to Gorny in a white envelope under the table at a restaurant (Tr. 253–69). Fleischman made one of his cash payments of $1,000 by handing Gorny an envelope in the men's room of a club where they were having lunch (Tr. 1082). None of the payments from Witt and Fleischman was included on Gorny's statement of economic interest which required that he list any individuals or partnerships from whom he had received a gift or gifts aggregating more than $500 during a single year (Tr. 1176–78).

While Gorny's receipt of these funds could not be linked directly to any action on a particular real estate assessment file, these practitioners enjoyed an unusually high rate of success in their practice before the Board. While the average success rate was 35%, Witt, for example, enjoyed a success rate of nearly 80% (Tr. 1207) and Fleischman a rate of approximately 93% (Tr. 1214). The overwhelming majority of the cases on which these practitioners received favorable treatment were handled by Gorny as the first reviewing official.

The twelfth count, for obstruction of a federal criminal investigation, was based on several conversations including one in which Gorny warned Witt that his files at the Board had been subpoenaed (Tr. 266–67). On another occasion, Gorny seems to have briefly attempted to encourage Witt to alter his account of the nature of the gifts he had given to Gorny (Tr. 273). The racketeering count, count eleven, was based on the pattern and practice of Gorny's conduct in accepting bribes, including both the previously described activities which underlay the ten counts of mail fraud and other similar incidents on which either the government declined to prosecute or Gorny received a directed verdict of acquittal.

## II

Gorny appeals his conviction on the ten mail fraud counts on the ground that the evidence was insufficient to support a conviction. This contention is based primarily on two assertions: first, that the evidence was insufficient to establish bribery or a cognizable scheme to defraud; second, that the mailing of the second tax statement reflecting the reduction granted by Gorny was insufficient to establish mail fraud. We shall examine each of these contentions.

Gorny argues that the money and business referrals he received were not bribes but rather were presents neither given nor taken with intent to influence the exercise of discretion in his work at the Board. The government, however, asserts that it demonstrated that Gorny received ten payments totalling approximately $9,000 from five lawyers and tax consultants who practiced before the Board and who achieved remarkably high rates of success in their practices. Thus, there was sufficient evidence for the jury to conclude that both Gorny and the various practitioners had the intent to influence official conduct improperly. Several of the witnesses, in fact, testified that they gave Gorny money or referrals with the intent to receive some form of favorable treatment from Gorny. *See* Tr. 385 (testimony of Berger), 275 (testimony of Witt), 1077–78 (testimony of Fleischman). In addition, the jury instructions, which were patterned closely on the applicable Illinois bribery law and to which the appellant has not objected, defined bribery as follows:

[B]ribery occurs when property or personal advantage is accepted by a public employee with knowledge that it is offered with intent to influence the performance of any act related to his public position. No particular act need be contemplated by the person offering the property or personal advantage, or by the public official to whom the offer is made. The crime is completed when the property or personal advantage is accepted by the public employee knowing it was offered with the intent that he act favorably to the person offering the property or personal advantage when necessary.

Tr. 1666–67. *See also* ILL.REV.STAT. ch. 38, § 33–1 (1981).

▮ The issue of intent is clearly a question of fact, particularly in a context, such as this one, where intent means "actual motive." As such, we cannot conduct an independent review of the facts but can only analyze the evidence to ascertain whether it was sufficient to support the jury determination of intent. This court has said, in considering a determination of the intent underlying payments to a public official, "[a]ssuming that the jury was properly instructed, and we find that it was, the characterization of these payments is properly left to them .... [and] 'primary weight in this area must be given to the conclusions of the trier of fact.'" *United States v. Scott,* 660 F.2d 1145, 1176 (7th Cir.1981) (quoting *Commissioner v. Duberstein,* 363 U.S. 278, 289, 80 S.Ct. 1190, 1198, 4 L.Ed.2d 1218 (1960)) (footnote omitted), *cert. denied,* 455 U.S. 907, 102 S.Ct. 1252, 71 L.Ed.2d 445 (1982). We therefore hold that there was sufficient evidence for the jury to have concluded that these payments and other favors were conferred upon Gorny with intent to influence him in the exercise of his discretion as an official of the Board. In addition, Gorny received these favors and payments with a like intent that he would be so influenced. *See also McManigal,* 708 F.2d at 282.

Gorny's second main contention is that the mailing of the second tax statement reflecting the reduction in the assessment was insufficient to constitute a mailing as required to sustain a conviction for mail fraud. The mail fraud statute requires that the mailing be made "for the purpose of executing ... [a] scheme" to defraud. 18 U.S.C. § 1341. In considering this issue, we are bound to follow our own recent precedent in *McManigal,* 708 F.2d 276 (7th Cir.), *vacated on other grounds,* — U.S. ——, 104 S.Ct. 419, 78 L.Ed.2d 355, *reaffirmed on other grounds,* 723 F.2d 580 (7th Cir.1983), which involved the conviction of an attorney who practiced before the same Board for bribery of several of Gorny's predecessors on the Board.

In this case, as in *McManigal,* the indictment charged Gorny with a scheme to defraud "Cook County and its citizens of their right to have real estate property taxes assessed and collected free from the influence of corruption, collusion, partiality, dishonesty, bribery and fraud." Appellant's Brief, Appendix at 3, Count 1, ¶ 4c. The indictment also alleged that part of the scheme was to cause real estate property tax bills incorporating the assessment reductions to be mailed from the Cook County Collector's Office to the property owners represented by the attorneys who had conferred benefits on Gorny. Count 1, ¶ 10.

This court held in *McManigal:*

> The mailings of what should have been legitimately determined tax bills were used by defendant both to advise the property owner of the amount of tax savings from the fraudulent reduction and to precipitate payment of McManigal's fee .... Thus ... the mails were used to carry out the scheme to defraud.

708 F.2d at 281. Further, we held that a mailing is in furtherance of a scheme if the defendant "commit[s] an act with knowledge that the use of the mails will follow in the ordinary course of business, or commit[s] an act when the use of the mails can reasonably be foreseen." *Id.* at 281 (citing *United States v. Stanford,* 589 F.2d 285, 295 (7th Cir.1978), *cert. denied,* 440 U.S. 983, 99 S.Ct. 1794, 60 L.Ed.2d 244 (1979)). *See also United States v. Feinberg,* 535 F.2d 1004, 1009 (7th Cir.), *cert. denied,* 429 U.S. 929, 97 S.Ct. 337, 50 L.Ed.2d 300 (1976). Gorny clearly anticipated that the second installment tax bills would be sent to the practitioners' clients. These bills were an essential part of the scheme because, unless the clients were notified that they had received tax assessment reductions, their attorneys would have been unaware that they had benefited by the scheme.

Gorny asserts that *McManigal* and *Feinberg* are not in point because in those cases the bribes were not paid until after the clients received their reduced tax bills and,

at least in *McManigal,* the amount of the bribe was calculated as a percentage of the tax savings realized. While in the case before us the link between the amount of the tax savings and the amount of the bribe is not as direct as in *McManigal* and *Feinberg,* the government has presented a scenario of an ongoing scheme of payments and assessment reductions. It does not matter whether a particular payment preceded or followed a particular influenced action because notice from the tax bills was necessary to assure the bribers that their efforts had been rewarded and thus to induce them to make further payments.

In *United States v. Galloway,* 664 F.2d 161, 164–65 (7th Cir.1981), *cert. denied,* 456 U.S. 1006, 102 S.Ct. 2296, 73 L.Ed.2d 1300 (1982), this court also relied on the ongoing character of the scheme to defraud to support a conviction for mail fraud. In *Galloway,* which involved a scheme to defraud by rolling back automobile odometers, the mailing at issue was the mailing of the title application by the auto dealer on behalf of the purchaser. Even though the title documents did not include reference to the false odometer mileage readings, the documents were held to be necessary to completion of the scheme and to the defendant's future success in perpetuating the scheme.

 In this case, the link between the scheme and the mailings is considerably closer than in *Galloway.* Here, the mailings of the reduced tax bills were part of an ongoing scheme to defraud, as in *Galloway,* but they also reflected fraudulently obtained tax reductions, as in *McManigal* and *Feinberg.* [2] We therefore hold that the mailings were sufficient to establish

mail fraud and that there was sufficient evidence from which the jury could find a scheme to defraud.

## III

The second major argument on which Gorny relies in this appeal is that the district court committed reversible error by permitting the government to include in its indictment counts relating to Zachary Stanger, permitting Stanger to testify as an adverse witness for the government and then permitting the government to impeach Stanger improperly. The circumstances surrounding these "Stanger counts" are complex, and they must be briefly summarized in order to understand the defendant's arguments.

Zachary Stanger was a close friend of the defendant from the time when they both worked as Assistant State's Attorneys. Stanger worked in the Personal Property Tax Unit and was responsible for compromising disputed assessments of personal property for tax purposes. Stanger testified at the trial that, after Gorny became an official at the Board, the two men each assisted the other in practicing covertly before their own respective tribunals— activities which it would have been inadvisable or improper for them to have engaged in openly. Stanger eventually left the State's Attorney's Office and then practiced openly before Gorny at the Board. Stanger attested to a series of referrals and other favors which he bestowed on Gorny, some possibly even without Gorny's knowledge, but asserted that these favors were conferred because of the close friend-

---

2. Gorny contends that the government failed to establish that the reductions granted were improper and that they would not have been granted absent the cash and favors given to him. The tax bills were not of themselves fraudulent according to this argument. The government did present at least circumstantial evidence that Gorny granted reductions which he would not have otherwise given after receiving payments (Tr. 223, 322, 1193–1217). Further, our decision in *Feinberg* reiterates that it is the use of fraud and deceit in obtaining the tax reduction which renders the scheme fraudulent, even if the same

reduction could have been obtained through honest means. 535 F.2d at 1008. It is Gorny's deprivation of the public of the exercise of his discretion in an unbiased and impartial manner which constitutes the fraud, not merely his granting a particular reduction which may have been unwarranted. The fact that Illinois law permits Board officials virtually unfettered discretion in determining reductions would make it almost impossible to establish that the reductions were in and of themselves fraudulent—absent the context of payments.

ship between them and not out of more ulterior motives.

The government had included in the indictment two counts of mail fraud based on these alleged favors bestowed by Stanger on Gorny. Before the trial the defendant had moved to dismiss or, in the alternative, to sever the Stanger counts on the grounds that they involved activities which were fundamentally different from the activities alleged in the other mail fraud counts and that prejudice would result from joinder of these counts. After the district court denied this motion, the defendant moved for an order to preclude the government from calling Stanger as a witness. Stanger had previously pled guilty to a charge of mail fraud and to a racketeering violation and had agreed to cooperate with the government in other prosecutions. Because the government had implied in the course of another prosecution that Stanger was not truthful in his testimony, Gorny alleged that the government knew that Stanger would commit perjury if allowed to testify at Gorny's trial.

The district court did permit Stanger to testify. The government, on direct examination, elicited testimony regarding transactions between Stanger and Gorny but did so without questioning Stanger about his motives in doing various favors for Gorny. On cross-examination, defense counsel then questioned Stanger about his motives, which he testified were based only on his close personal friendship with Gorny. On redirect, the government then undertook to impeach Stanger's credibility primarily on the basis of his own prior illegal dealings which did not involve Gorny.

Gorny alleges that the government's only purpose in calling Stanger to testify was to present extensive testimony concerning Stanger's wrongdoing which would then implicate Gorny as Stanger's closest friend. Gorny relies on the fact that the district judge granted his motion for acquittal on the two Stanger counts to assert that the government did not have a *prima facie* case against Gorny on those counts and

that they were essentially a ruse to permit the government to present prejudicial and otherwise inadmissible testimony. Gorny now argues that these errors were so prejudicial to him that, despite his acquittal on those two counts, the case against him was severely tainted and his conviction on the other counts must be reversed.

■ First, we find no error in the district court's failure to dismiss or to sever the Stanger counts before trial. The allegations on which the Stanger counts were based were essentially similar to those underlying the mail fraud counts. The fact that in some instances the favors took the form of cash payments and in others the form of referral fees, covertly earned attorney fees or more intangible benefits does not render the favors, or the scheme of which they were allegedly a part, substantively different. Further, the Stanger counts formed additional underlying predicate offenses constituting the pattern of bribery in the racketeering count, and the joinder of such counts is generally held to be proper. *United States v. Kabbaby,* 672 F.2d 857, 860 (11th Cir.1982); *United States v. Thevis,* 474 F.Supp. 117, 130–31 (N.D.Ga.1979), *aff'd on other grounds,* 665 F.2d 616 (5th Cir.), *cert. denied,* 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303 (1982).

After Gorny's acquittal on the Stanger counts, the district judge gave proper limiting instructions to the jury not to consider any of the evidence presented on those counts in deliberating on the other counts, and there is no reason apparent in the record to assume that the jury disregarded the court's instructions. *See United States v. Aleman,* 609 F.2d 298, 310 (7th Cir.1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. Dansker,* 537 F.2d 40, 52 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). We therefore conclude that in these circumstances there was no error in the joinder of, and failure to dismiss, these counts.[3]

**3.** The government contends that the defendant waived this argument by failing to move for a

■ The government's calling of Stanger as a witness and its subsequent impeachment of him were also not reversible error. Under Rule 607 of the Federal Rules of Evidence, the credibility of a witness can be attacked by any party, including the party calling the witness. It is possible for a party to abuse this rule, and prosecutorial conduct, in particular, must be carefully scrutinized to ascertain that a witness has not been called merely for the purpose of introducing irrelevant evidence or of establishing the defendant's guilt by association with the witness. The rule which no longer requires a party to vouch for the veracity of its witnesses could be misused as a vehicle for the introduction of this sort of improper evidence.

However, Gorny's argument seems to depend on an assumption that the government had these improper intentions in bringing the Stanger counts and in calling Stanger as a witness. To credit this argument, we would further have to assume that the government's case against Gorny on the Stanger counts was a sham and that it never intended to establish its case on those counts. Examination of the record and particularly of the trial transcript reveals that these assumptions are unwarranted. Stanger's testimony shows that there was a pattern of mutual aid in engaging in questionable practices before government agencies. At the same time, Stanger enjoyed a remarkable success rate in achieving assessment reductions; for example, he succeeded in 102 of 109 cases in which he sought reductions in the 1978 tax year (Tr. 794). Admittedly, the government did not on direct examination question Stanger about his motives but relied on inferences to establish the intent needed to convict on these counts. At that point, there was no need to impeach Stanger or to assume that Stanger had committed perjury.[4]

It was only after defense counsel elicited testimony as to Stanger's innocent motives that the government undertook on its redirect examination to impeach Stanger. The government took the risk that if there had been no cross-examination as to motive, then it could not have impeached him and could never have presented the evidence concerning Stanger's questionable past. Further, the government's case on the Stanger counts on direct examination largely followed the pattern of direct examination of other witnesses on the other counts in which the government had presented testimony of circumstantial evidence of bribery but had left inferences as to motive and intent to be drawn by the jury.

It thus appears that the government presented an adequate case against Gorny on the Stanger counts and their inclusion cannot be viewed as a mere sham to introduce inadmissible evidence. These circumstances present a situation which must be subjected to careful judicial scrutiny to avoid possible misconduct or abuse. Under the particular circumstances before us, however, and especially with the giving of appropriate limiting instructions, the government's presentation of this witness and its subsequent impeachment of its own witness did not result in unfair prejudice to the defendant which substantially outweighed the probative value of the evidence. There was no reversible error.

IV

The defendant raises two additional arguments which need not be considered in great detail. The first concerns the validi-

---

mistrial following his acquittal on the Stanger counts. Appellee's Brief at 43. We do not need to address this issue in light of our holding that there was no error in the joinder of, or failure to dismiss, these counts.

**4.** In the usual situation, government use of perjured testimony helps in achieving the conviction of the defendant. *See, e.g., Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *United States v. Udziela,* 671 F.2d 995 (7th Cir.), *cert. denied,* 457 U.S. 1135, 102 S.Ct. 2964, 73 L.Ed.2d 1353 (1982). In this case, however, if Stanger had, in the government's view, committed perjury, then his "perjured" testimony would have helped to exculpate Gorny. This reversal of the usual scenario distinguishes this case from those cited by the defendant.

ty of Gorny's conviction on the RICO count if the convictions on the mail fraud counts had been reversed. This is moot in view of the affirmance of the mail fraud convictions.

 Finally, the defendant argues that the evidence was insufficient to sustain his conviction for obstructing a federal criminal investigation in violation of 18 U.S.C. § 1510. This conviction was based on Witt's testimony that he and Gorny had discussed the F.B.I. investigations and, in particular, that in the spring of 1981 Gorny encouraged Witt to lie when he told Witt to say that he had only given Gorny a case of liquor at Christmas time (Tr. 273). The essence of Gorny's argument is that at the time of this conversation Witt was under subpoena from the grand jury and therefore Gorny should have been charged under 18 U.S.C. § 1503, which concerns obstruction at the grand jury stage.

The government responds by arguing, first, that Gorny waived this objection by failing to object at trial; second, that the F.B.I. investigation was carried out on behalf of the grand jury and so obstruction of one amounted to obstruction of the other; and, third, that the operation of section 1510 and section 1503 is not intended to be mutually exclusive. In *United States v. Koehler*, 544 F.2d 1326, 1328–30 (5th Cir. 1977), the court said that "[t]he provisions of Section 1510 do not exclude its applicability merely because an indictment has been returned or judicial proceedings have been initiated." *See also United States v. Roberts*, 638 F.2d 134, 135 (9th Cir.), *cert. denied*, 452 U.S. 909, 101 S.Ct. 3039, 69 L.Ed.2d 411 (1981). The holdings in *Koehler* and in *Roberts*, and the common sense of a non-exclusive interpretation of these two sections, lead us to conclude that the conviction under 18 U.S.C. § 1510 should be affirmed.

We must also reject Gorny's final argument that sections 1510 and 1503 were not intended to apply to communications between alleged accomplices in the commission of underlying federal offenses. In both *Koehler* and *United States v. Berardi*, 675 F.2d 894, 902–04 (7th Cir.1982), sections 1510 and 1503, respectively, were applied to communications between alleged accomplices. Therefore, the fact that Witt allegedly participated with Gorny in the fraudulent scheme which was the subject of the F.B.I. and grand jury investigations does not protect Gorny from prosecution for obstructing this investigation by encouraging Witt to misrepresent their relationship.

We therefore affirm the conviction of Gorny for mail fraud, RICO violations and obstruction of a federal criminal investigation.