**UNITED STATES of America**

v.

**Rocco Ernest INFELISE and Salvatore DeLaurentis.**

**No. 90 CR 87.**

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 23, 1996.

**1356**

Patrick A. Tuite, Arnstein & Lehr, Peter A. Regulski, Anthony J. Onesto, Chicago, IL, for Plaintiff/Petitioner.

David D. Buvinger, Stephen Anderson, Assistant U.S. Attorney, Chicago, IL, for Defendant/Respondent.

## MEMORANDUM OPINION AND ORDER

ANN CLAIRE WILLIAMS, District Judge.

Before the court are petitions by defendants and third parties seeking to amend a 1992 criminal forfeiture order entered by the court pursuant to 18 U.S.C. § 1963. In addition, the United States seeks a final forfeiture order and moves for forfeiture of various substitute assets pursuant to 18 U.S.C. § 1963(m).

### Background

Salvatore V. DeLaurentis and Rocco E. Infelise were among twenty defendants convicted in 1992 of conspiracy in violation of the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962. The RICO case was based on predicate acts of murder, extortion, bribery and other offenses committed by the defendants as members of the Ferriola Street Crew, a subdivision of the Chicago Outfit "Mob" organization. Upon conviction, the jury returned a special verdict pursuant to 18 U.S.C. § 1963 ordering forfeiture to the United States of various pieces of real property belonging to DeLaurentis, Infelise, and their families. In addition, the jury ordered DeLaurentis and Infelise to forfeit $3,000,000 in proceeds from their RICO activities, for which they were jointly and severally liable. To satisfy this $3,000,000 judgment, the government subsequently moved for forfeiture of additional property of DeLaurentis and Infelise as substitute assets pursuant to 18 U.S.C. § 1963(m), including houses, jewelry, bank accounts and investment accounts. After receiving notification of the forfeiture order, members of both the DeLaurentis and Infelise families petitioned the court to amend its order, claiming third party interest in much of the forfeited property.[1] The parties then engaged in extensive

---

1. The arguments of the parties relevant to forfeiture issues are best understood by reading the following documents: (1) Petition to Amend the Order of Forfeiture to Provide for the Interests of Innocent Third Parties filed July 24, 1992 [doc. no. 1424]; (2) Petition of Ann Infelise for Remission or Mitigation of Forfeiture filed July 23, 1992 [doc. no. 1422]; (3) Rocco Infelise's Response to Government's Motion for Order of Forfeiture filed August 21, 1992 [doc. no. 1446]; (4) United States Memorandum of Law in support of its forfeiture motion filed January 23, 1995 [doc. no. 2104]; (5) Motion for Forfeiture of Assets Pursuant to 18 U.S.C. § 1963(m) filed February 1, 1995 [doc. no. 2116]; (6) Memorandum in Support of the Petition to Amend the Order of Forfeiture to Provide for the Interests of Innocent Third Parties filed January 25, 1995 [doc. no. 2112]; (7) Motion for Release of Restrained Assets filed January 25, 1995 [doc. no. 2107]; (8) Rocco Infelise's Memorandum Regarding Forfeiture filed January 25, 1995 [doc. no. 2106]; (9) United States Reply Memorandum of Law filed February 21, 1995 [doc. no. 2133]; (10) Claimants' Reply to the United States Memorandum of Law filed February 27, 1995 [doc. no. 2137]; (11) Reply Memorandum on Behalf of Rocco Infelise filed February 27, 1995 [doc. no. 2140]; (12) United States Response to Infelise and DeLaurentis Reply Memoranda of Law filed March 10, 1995 [doc. no. 2148]; (13) Claimants' Reply to the United States' Reply Memorandum of Law filed March 10, 1995 [doc. no. 2149].

discovery on the forfeiture issues, agreed to a set of Omnibus Factual Stipulations, and assembled a series of Joint Group Exhibits. In order to expedite the court's consideration of the forfeiture issues, the parties agreed to waive a formal evidentiary hearing on the third party petitions, asking the court to rely instead on the stipulations and exhibits, along with affidavits, the trial record and the parties' briefs.

On March 1, 1996, the Seventh Circuit affirmed the convictions of DeLaurentis, Infelise and their co-defendants, but ordered the resentencing of DeLaurentis. *United States v. DiDomenico*, 78 F.3d 294 (7th Cir. 1996). The court is now prepared to issue a final order of forfeiture.

### Analysis

The court will first address property relating to DeLaurentis, and will then address property relating to Infelise.

## I. PROPERTY OF SALVATORE DE-LAURENTIS

Three items pertaining to Salvatore De-Laurentis are at issue. The two principal items are real property in Inverness and Island Lake, Illinois. Because their disposition depends on common principals of trust law, the court will begin by providing the relevant law covering both items, and will then proceed to offer background facts and analysis for each item separately. The third item, a bank account, will be addressed last.

### A. Relevant Law

Under 18 U.S.C. § 1963, the government may seek forfeiture of certain property belonging to an individual who violates 18 U.S.C. § 1962. Section 1963(a) describes the three general categories of forfeitable property interests: (1) those "acquired or maintained in violation of Section 1962;" (2) those "affording a source of influence over any enterprise" operated in violation of Section 1962; and (3) those "constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of Section 1962."

■ Under the "relation back" doctrine of 18 U.S.C. § 1963(c), the government's interest in a convicted RICO defendant's property vests at the time of the commission of acts that give rise to the forfeiture. If a defendant transfers the property after the commission of the acts, the government's interest in the property remains paramount unless the transferee can show, by a preponderance of the evidence, either that: (a) his interests and rights in the property were superior to the defendant's at the time of the commission of the acts; or (b) he was a bona fide purchaser for value who was reasonably without cause to believe that the property was subject to forfeiture. 18 U.S.C. § 1963(*l*)(6).

■ If forfeited property cannot be located or is otherwise unavailable, the government may, pursuant to 18 U.S.C. § 1963(m), seek forfeiture of any other property of the defendant as a substitute asset up to the value of the unavailable forfeited property.

■ To determine the extent of a defendant's interest in forfeited property, federal courts turn to state property law. *United States v. Marx*, 844 F.2d 1303, 1305 (7th Cir.1988), *cert. denied*, 503 U.S. 939, 112 S.Ct. 1480, 117 L.Ed.2d 623 (1992). A resolution of the disputes over 411 Lauder Lane and 103 East State Road therefore turns on Illinois trust law. Three types of trusts are relevant here: express trusts, resulting trusts and constructive trusts.

■ **Express Trusts.** Under Illinois law, an express trust exists where there is: (1) intent of the parties to create a trust; (2) a definite subject matter or trust property; (3) ascertainable beneficiaries; (4) a trustee; (5) specifications of a trust purpose and how the trust is to be performed; and (6) delivery of the trust property to the trustee. *In re Marchiando*, 142 B.R. 246, 249–50 (N.D.Ill. 1992), *aff'd*, 13 F.3d. 1111 (7th Cir.1994), *cert. denied*, — U.S. —, 114 S.Ct. 2675, 129 L.Ed.2d 810 (1994); *In re Estate of Zukerman*, 218 Ill.App.3d 325, 161 Ill.Dec. 121, 124, 578 N.E.2d 248, 251 (1991); *Estate of Wilkening*, 109 Ill.App.3d 934, 65 Ill.Dec. 366, 371, 441 N.E.2d 158, 163 (1982). If the existence of any one of these elements is uncertain, no trust is created. *Wilkening*, 65 Ill.Dec. at 371, 441 N.E.2d at 163; *Marchiando*, 142 B.R. at 250. To determine whether intent to

create an oral express trust existed, Illinois courts look to the conduct of the parties to see if they treated the property as if it were the subject of a trust. *Zukerman*, 161 Ill. Dec. at 125, 578 N.E.2d at 252. In the context of a forfeiture case, where a preexisting trust is asserted to avoid forfeiture of property, the proximity in time between government efforts to prosecute a defendant and the emergence of evidence proving the existence of the trust becomes especially relevant. *United States v. 10652 South Laramie*, 779 F.Supp. 952, 955 (N.D.Ill.1991). Scrutiny of such timing is necessary to prevent "sham transfers" of property to third parties by defendants facing forfeiture. *Id.*

■ In addition, Illinois' Statute of Frauds requires that express trusts in land be in writing. 740 ILCS 80/9 (ILL. ANN.STAT. 1993). This writing requirement applies to the transfer of a beneficial interest in an Illinois land trust. *IMM Acceptance Corp. v. First Nat. Bank and Trust Co.*, 148 Ill. App.3d 949, 102 Ill.Dec. 232, 236, 499 N.E.2d 1012, 1016 (1986). The written manifestation of the express trust, however, need not be a formal trust agreement, nor need it be executed contemporaneously with the declaration of trust. *E.g., Kellogg v. Peddicord*, 181 Ill. 22, 54 N.E. 623, 626 (1899) (later deposition was satisfactory); *First Nat. Bank of Ottawa v. Weise*, 333 Ill.App. 1, 76 N.E.2d 538, 542 (1948) (various letters and correspondence sufficed).

■ The Statute of Frauds is an affirmative defense and use of it to undermine an oral trust agreement is limited to the parties to the purported trust and their privies. *Pasquay v. Pasquay*, 235 Ill. 48, 85 N.E. 316, 320 (1908); *Whildin v. Kovacs*, 93 Ill.App.3d 582, 49 Ill.Dec. 46, 47, 417 N.E.2d 736, 737 (1981). Strangers to the trust agreement are thus unable to invoke it. *Haas v. Cravatta*, 71 Ill.App.3d 325, 27 Ill.Dec. 414, 416–17, 389 N.E.2d 226, 228–29 (1979) (trial court could not raise it sua sponte). In other words, "an oral trust in violation of the Statute of Frauds is voidable at the election of the trustee, but not void" per se. *In re German*, 193 F.Supp. 948, 952 (S.D.Ill.1961) (citing *Klass v. Hallas*, 16 Ill.2d 161, 157 N.E.2d

261, 265 (1959)).[2] In addition, the Statute of Frauds cannot be invoked to avoid a trust that has been fully performed. *David v. Schiltz*, 415 Ill. 545, 114 N.E.2d 691, 697 (1953); *In re Naramore*, 3 B.R. 709, 714 (N.D.N.Y.1980) (applying New York law). But this full performance must be done solely on account of the oral agreement, and not, for example, to carry out a subsequent need to keep property out of the reach of creditors. *Murray v. Behrendt*, 399 Ill. 22, 76 N.E.2d 431, 433 (1947); *In re Fill*, 82 B.R. 200, 222–23 (Bankr.S.D.N.Y1987).

■ Regardless of whether the Statute of Frauds applies to an express trust, parol evidence offered to prove the existence of an express trust must be clear, unambiguous and unequivocal: "if the evidence is doubtful or capable of reasonable explanation upon theories other than the existence of a trust, it is not sufficient." *Carrillo v. O'Hara*, 400 Ill. 518, 81 N.E.2d 513, 520 (1948); *In re Wilkening*, 65 Ill.Dec. at 371, 441 N.E.2d at 163

■ **Resulting Trusts.** If all the requisite elements of an express trust do not exist, two classes of implied trusts can arise outside of the Statute of Frauds by operation of law: resulting trusts and constructive trusts. *Murray*, 76 N.E.2d at 434. A resulting trust arises by law when one party receives title to property, but under circumstances which raise an inference that—despite having failed to express an intent to do so—the parties intended the title holder to hold the property in name only for the benefit of another. *Id.; Janes v. First Fed. Savings and Loan Ass'n*, 11 Ill.App.3d 631, 297 N.E.2d 255, 261 (1973). Typically, a resulting trust arises "when land is purchased with the money of one party and title is taken by another and hence it is presumed that title is held in trust for the purchaser." *Suwalski v. Suwalski*, 40 Ill.2d 492, 240 N.E.2d 677, 680 (1968). Because a resulting trust arises to effectuate the intent of the

---

**2.** One recent forfeiture case decided in this district, *United States v. 10652 South Laramie*, 779 F.Supp. 952 (N.D.Ill.1991), applying Illinois law, seems to take for granted that a court, on the government's urging, can invoke the statute of frauds to render an oral trust agreement void. No cases are cited in support of this assumption, however. This part of the opinion appears to conflict with Illinois law, and this court declines to follow it.

parties, it is essential that those seeking to assert a resulting trust establish that such intent actually existed and was evidenced in the parties' conduct. *Wilkening*, 65 Ill.Dec. at 372, 441 N.E.2d at 164; *Suwalski*, 240 N.E.2d at 680. Such evidence "must be clear, unequivocal, and unmistakable, and, if it is doubtful or is capable of reasonable explanation upon any theory other than the existence of a trust, it is not sufficient." *Link v. Emrich*, 346 Ill. 238, 178 N.E. 480, 482 (1931).

■ **Constructive Trusts.** By contrast, a constructive trust does not depend on intent, but arises by law when a party obtains title to property through fraud, breach of fiduciary relationship or other wrongful conduct and thus has an equitable duty to convey it to another to prevent unjust enrichment. *Janes*, 297 N.E.2d at 261; *Murray*, 76 N.E.2d at 434.

### B. *411 Lauder Lane, Inverness, Illinois*

#### 1. Background

In November 1977, Victoria and Jerry DeLaurentis, the parents of defendant Salvatore V. DeLaurentis, purchased property at 3017 Eastway Lane in Island Park, Illinois.[3] (Omnibus Factual Stipulations ¶ 5). Victoria and Jerry financed the acquisition with a $70,000 mortgage, payable in one year. (*Id.*) They placed the property in a trust in the McHenry State Bank. (*Id.* ¶ 4.) In September 1978, after selling another residence, Victoria and Jerry paid off approximately one half of the mortgage on the Island Lake property. (*Id.* ¶ 8.) At the same time, they assigned the beneficial interest in the McHenry State Bank trust to their son, Salvatore. (*Id.* ¶ 9.) In October 1978, Salvatore secured a loan and paid off the balance of the mortgage on the property. (*Id.* ¶¶ 10–11.) In August 1979, Salvatore executed an amendment to the McHenry State Bank trust, altering the beneficial interest in the trust to read as follows:

SALVATORE V. DELAURENTIS, the entire beneficial interest hereunder, with full power to assign or deal with all of the

rights and interests of the beneficial interest. Upon the death of said Salvatore V. DeLaurentis during the existence of this trust, and provided that the beneficial interest or any part or right thereunder, shall not have been previously assigned or otherwise disposed, then the entire beneficial interest hereunder shall vest in the surviving children of Salvatore V. DeLaurentis in equal shares.

(*Id.* ¶ 14.)

In May 1986, Salvatore sold the Island Lake property and used the proceeds, along with a new loan and mortgage, to buy property at 411 Lauder Lane, Inverness, Illinois as joint tenant with his wife, Donna M. DeLaurentis. (Joint Group Ex. No. 26.) Salvatore and Donna placed this property in a trust with the Cole Taylor Bank, and thereby transferred the corpus of the McHenry State Bank trust that served the Island Lake property to this new trust. (*Id.*) On July 15, 1987, Salvatore and Donna set up a new Cole Taylor Bank Trust, transferring title in 411 Lauder Lane to this trust subject to its terms, which read, in part:

The following named persons shall be entitled to the earnings, avails and proceeds of said real estate as set forth, to wit:

Donna and Gianna Marie DeLaurentis as joint tenants with right of survivorship, as to an undivided 50% interest upon the demise of the survivor then to the following living parties: Vicki Belleno, Gina DeLaurentis Johnson, Salvatore A. DeLaurentis [Jr.] and Vincent C. DeLaurentis.

Vicki Belleno, Gina DeLaurentis Johnson, Salvatore A. DeLaurentis [Jr.] and Vincent C. DeLaurentis as tenants in common with rights of survivorship as to an undivided 50% interest, upon the demise of the survivor then to Donna M. DeLaurentis and Gianna Marie DeLaurentis or the survivor thereof.

The power of direction under the terms of the trust for such property is as follows:

---

**3.** Given that most of the individuals referred to in this opinion share the last name "DeLaurentis," the court will hereinafter refer to members of the DeLaurentis family by their first names. Thus, the court will refer to Defendant Salvatore

V. DeLaurentis as "Salvatore." To avoid confusion, the court will refer to the defendant's son, Salvatore A. DeLaurentis, Jr. by his full name or by the name "Salvatore Jr."

Donna M. DeLaurentis and upon her demise then to Vicki Belleno.

(Omnibus Factual Stipulations ¶ 95.)

On May 31, 1986—after Jerry and Victoria had transferred the property to Salvatore but before the establishment of the 1987 trust—a conversation was consensually recorded between Les Perrelli and Salvatore at 411 Lauder Lane during which Perrelli paid a portion of a gambling debt owed to Salvatore. (*Id.* ¶ 71.)

Following Salvatore's 1992 conviction under the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, the jury returned a special forfeiture verdict on March 11, 1992, finding, among other things, that Salvatore's interest in 411 Lauder Lane was subject to forfeiture by the United States pursuant to 18 U.S.C. § 1963. On July 24, 1992, Salvatore's parents, wife and children ("the petitioners") filed a Petition to Amend the Order of Forfeiture to Provide for the Interests of Innocent Third Parties, pursuant to 18 U.S.C. § 1963(*l*)(2). Petitioners claimed, among other things, that when Victoria and Jerry transferred the Island Lake property to Salvatore in 1978, they created an express oral trust under which the Salvatore was to maintain the property as trustee on behalf of his children, the trust's true beneficiaries. Petitioners assert that the existence of this express trust renders the court's forfeiture order of 411 Lauder Lane invalid, because Salvatore never held the property as anything more than a trustee, and at all times his children had superior interests. Alternatively, petitioners contend that their interest in the property remains viable under a resulting or a constructive trust theory.

The government denies that Victoria and Jerry created an express trust in 1978, given that intent to do so has not been proven and the oral trust was never evidenced in writing. In addition, the government contends that its interest in defendant's portion of the property vested in 1986, when acts in furtherance of a RICO conspiracy occurred on the premises, and that the 1987 written trust was a sham transfer designed to thwart forfeiture efforts.

In 1993, upon agreement of all the parties, this court approved the sale of 411 Lauder Lane. One half of the proceeds went to Salvatore's wife and children, and the other half ($118,042.53) is being held as "substitute res" pending a final forfeiture decision by this court. (Omnibus Factual Stipulations ¶ 143.)

### 2. Analysis

As explained above, to claim their right to the entire 411 Lauder Lane property, the petitioners bear the burden of proving, by a preponderance of the evidence, that either: (A) their interest in the property was superior to Salvatore's at the time of the commission of the acts that gave rise to the forfeiture; or (B) they were bona fide purchasers for value of the property. 18 U.S.C. § 1963(*l*)(6). For the reasons stated below, the petitioners fail to satisfy this burden.

**Express Trust.** To decide if the petitioners can satisfy the first of these two possibilities, the court must determine whether the petitioners possessed a superior interest in the property in 1986, when an act giving rise to forfeiture occurred at 411 Lauder Lane. This question turns on the validity of the purported express oral trust in 1978 involving the Island Lake property. Under this trust, petitioners claim, Victoria and Jerry assigned the interest in the McHenry State Bank trust to Salvatore to hold for the benefit of his children. They also assert that the trust assignments transferred to the Cole Taylor Bank trust in 1986 when Salvatore sold the Island Lake property and used the proceeds to buy 411 Lauder Lane with his wife. If the 1978 express oral trust in fact existed, then the petitioners' interest in 1986 would have been superior to that of Salvatore, and forfeiture of the property would be barred.

▮▮▮▮ As an initial matter, the existence of this oral trust is not undermined by the Statute of Frauds, because the parties to the purported oral trust do not assert this defense. The only party to raise the issue is the government, which does not have standing to invoke the Statute of Frauds as a stranger to the trust. *Whildin,* 49 Ill.Dec. at 47, 417 N.E.2d at 737; *In re German,* 193 F.Supp. at 952.

The purported trust fails, however, because petitioners have not proven the requisite element of intent to create a trust by a preponderance of the evidence. The facts show that the 1978 transfer to Salvatore from his parents was a conveyance of full beneficial interest, unaccompanied by an express oral trust to hold the property on behalf of his children. Nothing in the language of the 1978 assignment even remotely suggests such an arrangement. The assignment, instead, unambiguously transferred all rights and benefits, including the power of direction, from parents to son. (Joint Group Ex. No. 24–I.) Petitioners' best evidence as to intent to create an express trust on behalf of Salvatore's children is the deposition testimony of Victoria and the signed verifications by other family members of petitioners' arguments. In light of the weight of contrary evidence, and the interest of Victoria and the rest of the DeLaurentis family in preventing forfeiture, the court finds that this evidence carries little weight.

Although Salvatore's 1979 amendment to the trust brought his children into the picture, it did not transfer full beneficial interest to them, and therefore it does not suffice as proof that the 1978 transfer was executed pursuant to an oral trust. The amendment, at most, made the children contingent beneficiaries of the trust. It stated that upon the death of their father, "provided that the beneficial interest or any part or right thereunder, shall not have been previously assigned or otherwise disposed, then the entire beneficial interest hereunder shall vest in the surviving children of Salvatore V. DeLaurentis in equal shares." (Joint Group Ex. No. 24–P.) The amendment thus implies that Salvatore was free to assign or transfer the property at his will, and that the beneficial interest would go to his children only if he chose not to transfer it. The execution of this amendment does not prove that Salvatore was holding the property merely as trustee for his children pursuant to a purported oral trust created by his parents. As the petitioners concede, under a valid Illinois land trust, the person holding the power of direction serves as a fiduciary and must act in the best interests of the beneficiaries. *Dorman v. Central National Bank*, 97 Ill.App.3d 429, 52 Ill.Dec. 810, 813, 422 N.E.2d 1019, 1022 (1981). In this case, petitioners cannot claim that Salvatore was acting in the best interest of his children (as purported beneficiaries), given that he executed an amendment under which he was free to transfer the property and thereby act against the interest of the purported beneficiaries. Thus, no such land trust could have been in existence. The 1979 amendment therefore fails to prove that Victoria and Jerry intended to create an express oral trust in 1978 when they assigned the property to their son. This conclusion is confirmed by the February 22, 1994 deposition of Victoria. During her deposition, Victoria listened to a reading of the 1979 amendment and testified that its language encompassed the full extent of her wishes in regard to the property. (Joint Group Ex. No. 36.) As the amendment merely named the children as contingent beneficiaries, for Victoria to state that it fulfilled her wishes and then to claim that she and her husband intended to make their grandchildren more than just contingent beneficiaries is contradictory.

In addition, Salvatore's actions in regard to the property after 1978 further refute the contention that he was holding it on behalf of his children subject to an express trust. Salvatore listed the Island Lake property as his own on several financial statements and loan applications. (Joint Group Ex. No. 25–A & 25–F.) Moreover, Salvatore for several years paid the mortgage on the property and deducted it from his income taxes. (*Id.* No. 39.) These actions are consistent with sole unhindered ownership of the property.

In the absence of any compelling evidence to the contrary, this court is unwilling to find that an express trust came into being in 1978. The deposition testimony of Victoria and the signed verifications offered in support of the express trust do little to refute this conclusion given the contradictions in Victoria's testimony, the obvious bias of testifying family members and Salvatore's actions subsequent to 1978. Petitioners have therefore failed to meet their burden under 18 U.S.C. § 1963(*l*)(6)(A) of proving by a preponderance of the evidence that they pos-

sessed a superior interest in the property at the time of acts giving rise to the forfeiture.

■ Likewise, petitioners have failed to satisfy the other possible avenue through which a third party can challenge a forfeiture order: they have not proven that they were bona fide purchasers of value of the property pursuant to 1963($l$)(6)(B). Petitioners offer no evidence that Salvatore received anything in exchange for executing the 1987 trust agreement on behalf of his children. Accordingly, the petitioners cannot be deemed bona fide purchasers of the property in 1987 and thus are unable to invoke 1963($l$)(6)(B). .

Petitioners advance two alternatives to the oral express trust theory in their petition, but neither successfully challenges the forfeiture order.

**Resulting Trust.** First, petitioners claim that in the absence of an express oral trust, the court should recognize petitioners' interests under a resulting trust theory. As explained above, however, a resulting trust arises to effectuate the intent of parties who place title in the hands of one party who holds the property in name only on behalf of another. *Murray,* 76 N.E.2d at 433. Without unambiguous proof of such intent, no resulting trust can be recognized. *Link,* 178 N.E. at 482. Given that petitioners have failed to prove intent on the part of Victoria and Jerry to create anything resembling this arrangement in 1978, the court rejects the resulting trust argument.

■ **Constructive Trust.** Second, petitioners contend that Salvatore's children are entitled to their father's interest in the property under a constructive trust theory. As explained above, a constructive trust is imposed to remedy the situation where one party, through wrongful acts, holds title to property that ought to pass to another to prevent unjust enrichment. *Janes,* 297 N.E.2d at 261. Petitioners' theory fails, however, because Salvatore did not obtain the property at issue through wrongful acts, but instead legitimately received it as a gift from his parents in 1978 and retained it rightfully thereafter. No proof exists indicating that the property was to be held on behalf of his children. Thus no constructive trust need

arise to prevent Salvatore from being unjustly enriched, since nobody but Salvatore was ever entitled to the property.

Given that petitioners have not met their burden of asserting a valid interest in the property, this court concludes that Salvatore's interest in the property remained intact from 1978, when his parents transferred the property to him, until 1986, when Salvatore committed an act giving rise to the forfeiture of the property. Upon commission of this act in 1986, Salvatore's interest in the property vested in the United States, under the "relation back" doctrine of 18 U.S.C. § 1963(c). Regardless of the validity of the 1987 written trust, then, the property remains forfeitable, as Salvatore executed this trust after interest in the trust had already vested in the United States.

In sum, the petitioners' claim regarding Salvatore's one-half interest in 411 Lauder Lane fails. Accordingly, the court orders forfeiture to the United States of the full "substitute res" for 411 Lauder Lane now deposited in the Seized Assets Deposit Fund of the United States Marshals Service.

### C. *103 East State Road, Island Lake, Illinois*

#### 1. Background

In August 1972, Jerry and Victoria purchased property at 103 East State Road in Island Lake, Illinois under a land contract. (Omnibus Factual Stipulations ¶ 2.) They bought this property in order to create parking spaces for their neighboring bowling alley. (Petition at 4.) Beginning in September 1973, Salvatore rented the property from his parents, his rent equaling the amount due to the seller under the land contract. (*Id.* at 5.) During the time he rented the property, Salvatore used it to open a liquor store. (*Id.*) In August 1982, final payments were made on the land contract and the deed passed to Victoria and Jerry in full. (Omnibus Factual Stipulations ¶ 26.) Also in August 1982, Salvatore subleased the property to Joseph Penze. (*Id.* ¶ 25.) On February 15, 1985, Victoria and Jerry quitclaimed the property to Salvatore. (*Id.* ¶ 58.) On July 15, 1987, Salvatore and his wife set up a trust at the

Cole Taylor Bank and transferred title in 103 East State Road to the trust, which read, in part:

> The following named persons shall be entitled to the earnings, avails and proceeds of said real estate as set forth, to wit:
>
> Vicki Belleno, Gina DeLaurentis Johnson, Salvatore A. DeLaurentis [Jr.] and Vincent C. DeLaurentis, all as tenants in common with rights of survivorship.
>
> The power of direction under the terms of the trust for such property is as follows: To Vicki Belleno and upon her demise to Gina DeLaurentis Johnson.

(*Id.* ¶ 96.)

In April and June of 1982, while Salvatore was renting the property, surveillance by the Federal Bureau of Investigation revealed "street tax" payments being made in his liquor store at 103 East State Road. (*Id.* ¶¶ 22 & 23.)

Following Salvatore's 1992 conviction under the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, the jury returned a special forfeiture verdict on March 11, 1992, finding, among other things, that Salvatore's interest in 103 East State Road was subject to forfeiture by the United States pursuant to 18 U.S.C. § 1963. On July 24, 1992, the petitioners filed their Petition to Amend the Order of Forfeiture to Provide for the Interests of Innocent Third Parties, pursuant to 18 U.S.C. § 1963(*l* )(2). The petitioners claimed, among other things, that in 1985, when Victoria and Jerry quitclaimed the property to their son, they created an express oral trust under which Salvatore was to maintain the property as trustee on behalf of his children, the trust's true beneficiaries. Petitioners assert that the existence of this express trust renders the court's forfeiture order invalid, because Salvatore never held the property as anything more than a lessee or a trustee, and at all times either his parents or his children had superior interests. Alternatively, petitioners contend that their interest in the property remains viable under a resulting or a constructive trust theory.

The government denies that Victoria and Jerry created an express trust in 1985, given that intent to do so has not been proven and the oral trust was never evidenced in writing. In addition, the government contends that its interest in the property vested in 1982, when acts in furtherance of a RICO conspiracy occurred on the premises, and that the 1987 written trust was a sham transfer designed to thwart forfeiture efforts. As an alternative, the United States has moved for forfeiture of the property as a substitute asset pursuant to 18 U.S.C. § 1963(m).

### 2. Analysis

As explained above, under 18 U.S.C. § 1963(m), if forfeited property cannot be located, the government may seek forfeiture of any other property of the defendant as substitute assets up to the value of the forfeited property. In the case at hand, the court ordered Salvatore and his co-defendant Infelise to forfeit, among other things, $3,000,000 in proceeds from their racketeering activity, for which they were deemed jointly and severally liable. Despite due diligence, the government has been unable to locate the bulk of the funds necessary to satisfy the $3,000,000 forfeiture order. (*See* Joint Group Ex. No. 45.) Accordingly, the government is free to seek forfeiture of substitute assets, and attempts to do so in regard to Salvatore's interest in 103 East State Road. The petitioners claim, however, that Salvatore never had a forfeitable interest in the property and that their interest in it became paramount in 1985, pursuant to an express oral trust created by Victoria and Jerry.

As with the 411 Lauder Lane property, to assert their right to the 103 East State Road property, the petitioners bear the burden of proving either that they possessed a superior interest in the property or that they were bona fide purchasers of the property. 18 U.S.C. § 1963(1)(6). For the reasons stated below, the petitioners fail to satisfy this burden, and the property is forfeitable under § 1963(m).[4]

---

4. The government's assertion that interest in 103 East State Road vested in the United States in

1982 when DeLaurentis was leasing the premises need not be answered, given the court's finding

To decide if the petitioners possessed a superior interest in the property, the court must determine the validity of the purported 1985 oral express trust. Under this trust, petitioners claim, Victoria and Jerry quitclaimed 103 East State Road to Salvatore with the understanding that he would hold the property for the benefit of his children. If the trust existed, then the petitioners' interest in the property would be superior to that of Salvatore, and forfeiture of the property as a substitute asset would be barred.

As with the 411 Lauder Lane property, the existence of this oral trust is not undermined by the Statute of Frauds, because the parties to the purported oral trust do not assert this defense. The only party to raise the issue is the government, which does not have standing to invoke the Statute of Frauds as a stranger to the trust. *Whildin,* 49 Ill.Dec. at 47, 417 N.E.2d at 737; *In re German,* 193 F.Supp. at 952.

 Just as with 411 Lauder Lane, however, the purported trust fails because petitioners have not proven by a preponderance of the evidence the requisite element of intent to create a trust. The facts show that the 1985 transfer to Salvatore from his parents was a full conveyance, unaccompanied by an oral express trust to hold the property on behalf of his children. Nothing in the brief language of the quitclaim deed remotely suggests such an arrangement. (Joint Ex. No. 33–E.) With respect to 103 East State Road, petitioners have even less evidence to prove intent than they have with respect to 411 Lauder Lane. Petitioners' evidence as to intent amounts to nothing more than the written trust executed in 1987 and depositions and affidavits given by Salvatore's family members in which they describe the oral express trust arrangement. This court is unwilling to find that the evidence presented suffices as proof of intent, given the timing of the written trust and the depositions, *see 10652 South Laramie,* 779 F.Supp. 952, 955—all carried out after Salvatore knew he was under intense investigation and faced possible forfeiture—and the fact that Salvatore and his co-defendants were recorded numerous times discussing ways to hide their assets (*see* Omnibus Factual Stipulations 123 & 124). All indications point to the conclusion that the 1987 written trust on behalf of Salvatore's children was not the embodiment of an oral trust agreed to in 1985 between Salvatore and his parents but was instead a sham designed to thwart government forfeiture efforts.

Salvatore's actions in regard to the property after 1985 further refute the contention that he was holding it on behalf of his children subject to an express trust. Salvatore listed 103 East State Road as his own on several financial statements, collected rental payments from Joseph Penze, and paid all real estate taxes on the property. (Joint Group Ex. 39; Omnibus Factual Stipulations ¶ 144.) Even after he supposedly transferred the right to all earnings derived from 103 East State Road to his children via the 1987 written trust, Salvatore continued to report rental income and real estate taxes from the property on his federal income tax returns for 1987 and 1988. (*Id.*) These actions are all consistent with sole unhindered ownership of the property.

As in the case of 411 Lauder Lane, the court is unwilling to find that an express oral trust came into being in the case of 103 East State Road. Petitioners have therefore failed to meet their burden under 18 U.S.C. § 1963(1)(6)(A) to prove by a preponderance of the evidence that they possessed a superior interest in the property. Likewise, petitioners have failed to prove that they were bona fide purchasers of value of the property pursuant to 1963(*l*)(6)(B). Petitioners offer no evidence that Salvatore received anything in exchange for executing the 1987 trust agreement on behalf of his children. Accordingly, the petitioners cannot be deemed bona fide purchasers of the property in 1987 and thus are unable to invoke 1963(*l*)(6)(B).

Petitioners' attempts to assert both a resulting trust and a constructive trust fail for the same reasons given in regard to 411 Lauder Lane. Given that petitioners have not met their burden under 1963(*l*)(6), the court finds that Salvatore's interest in 103 East State Road has remained intact. Ac-

that the property is forfeitable as a substitute asset.

cordingly, the court orders forfeiture of this property to the United States as a substitute asset pursuant to 18 U.S.C. § 1963(m), in partial satisfaction of the $3,000,000 in proceeds ordered forfeited in 1992.

### D. *Checking Account in State Bank of Lake Zurich*

#### 1. Background

In September 1984, Salvatore opened checking account number 0000272876 in the State Bank of Lake Zurich in his own name. (Joint Group Ex. No. 38.) On February 6, 1990, following his indictment on RICO charges, the court entered an order pursuant to 18 U.S.C § 1963(d) restraining the disposition of this account and other cash assets belonging to Salvatore. This was done to ensure the availability of "substitute assets" under 18 U.S.C. § 1963(m) if Salvatore was eventually convicted but property that was ordered forfeited could not be found. Following Salvatore's conviction, the Government moved to seize the funds in the account[5] as substitute assets in partial satisfaction of the $3,000,000 in RICO proceeds ordered forfeited by the court from Salvatore and his co-defendant Infelise.

On July 22, 1994, Donna M. DeLaurentis, wife of Salvatore, and Gianna Marie DeLaurentis, Salvatore's minor daughter, filed a Motion for Release of Restrained Assets. Petitioners asserted that the checking account had been illegally restrained in 1990, claiming that pre-conviction restraint of substitute assets was forbidden under federal law, thus mandating the full release of the funds. Alternatively, petitioners contend that they are entitled to retain at least $2,000 from the account because under Illinois law, that much of a debtor's personalty is exempt from forfeiture pursuant to the "wild card" provision of 735 ILCS 5/12–1001(b) (ILL. ANN.STAT.1992).

#### 2. Analysis

The court rejects as moot petitioners' argument that the account was wrongly restrained in 1990. While the issue of pre-trial restraint of substitute assets has yet to be addressed by the Seventh Circuit and has split other circuits,[6] that is not the question before the court at present. Salvatore stands convicted of violating 18 U.S.C. § 1962, so the account is fully forfeitable under 18 U.S.C. § 1963(m) to the extent it is needed as a substitute for unavailable forfeited assets. It is therefore irrelevant whether pre-trial restraint of the account was inappropriate. Petitioners had ample opportunity to contest restraint of the account prior to conviction, but failed to do so. Given the relatively small amount of money at issue, the court sees no need to delve into the issue any further.

Petitioners' argument regarding the $2,000 Illinois exemption fails because federal forfeiture law clearly supersedes such state provisions. The language of 18 U.S.C. § 1963(a) is unequivocal on this point, calling for forfeiture to the United States "irrespective of any provision of States law." In an analogous case, the U.S. Supreme Court ruled that a similar Minnesota provision could not, under the Supremacy Clause, interfere with the federal government's efforts to seize the property of a delinquent taxpayer. *United States v. Rodgers,* 461 U.S. 677, 701, 103 S.Ct. 2132, 2146, 76 L.Ed.2d 236 (1983); *United States v. Curtis,* 965 F.2d 610, 616 (8th Cir.1992); *see also United States v. Martenson,* 780 F.Supp. 492, 495 (N.D.Ill. 1991) (applying *Rodgers* to RICO forfeiture). Therefore, the $2,000 Illinois "wild card" exemption of 735 5/12–1001(b) fails to benefit the petitioners.

In conclusion, the court rejects petitioners' Motion for Release of Restrained Assets and orders forfeiture of the full value of the State Bank of Lake Zurich checking account to the United States in partial satisfaction of the $3,000,000 in RICO proceeds ordered forfeit-

5. As of August 3, 1994, the account had a balance of $2,398. (Joint Group Ex. No. 38.)

6. *See, e.g., In re Assets of Martin,* 1 F.3d 1351 (3rd Cir.1993); *United States v. Floyd,* 992 F.2d 498 (5th Cir.1993); *In re Billman,* 915 F.2d 916 (4th Cir.1990), *cert. denied,* 500 U.S. 952, 111 S.Ct. 2258, 114 L.Ed.2d 711 (1991).

ed by the court from Salvatore and his co-defendant Infelise.

### E. Seized Currency

Between 1983 and 1986, law enforcement officers seized various amounts of currency upon the execution of four search warrants carried out during the investigation of Salvatore, Rocco Infelise and other co-defendants. (Omnibus Factual Stipulations ¶¶ 42, 83, 84 & 103.) Although the currency is not at present the property of the defendants, the government does not oppose crediting Salvatore and Infelise with the total amount of currency seized ($175,974.18) in partial satisfaction of the $3,000,000 ordered forfeited from the two of them to the United States. Accordingly, the court orders forfeiture to the United States of this currency pursuant to 18 U.S.C. § 1963(m) in partial satisfaction of the $3,000,000 forfeiture.

### F. Summary

In sum, the court denies the DeLaurentis petitioners' third party petition regarding the Inverness and Island Lake properties as well as their Motion for Release of Restrained Assets. The court orders forfeiture to the United States of Salvatore's one-half interest in the Inverness property, the entirety of the Island Lake property, the State Bank of Lake Zurich Account, and the seized United States currency.

## II. PROPERTY OF ROCCO INFELISE

### A. 1535 North River Forest Avenue, River Forest, Illinois

#### 1. Background

In December 1981, Rocco E. Infelise ("Infelise") and his wife, Ann M. Infelise (hereinafter "Ann" or "Ann Infelise"), purchased apartment 202 at 1535 North Forest Avenue, River Forest, Illinois as joint tenants. (Omnibus Factual Stipulations ¶ 20.) On February 14, 1983, Infelise quitclaimed his interest in the property to Ann. (Id. ¶ 35.) Prior to the quitclaim, on January 15, 1983, government agents seized a number of tape recordings made by William Jahoda ("Jahoda"). (Id. ¶¶ 30 & 63.) One of these recordings contained a phone conversation in which Ann,

speaking from 1535 North Forest Avenue, took a coded message from Jahoda for her husband regarding bookmaking profits. (Id.) During Infelise's subsequent trial, Jahoda testified that beginning in 1979 and continuing through 1983, he and Infelise spoke several times a week about their gambling operation, with Infelise often speaking from 1535 North Forest Avenue. (Transcript of Jahoda trial testimony at 1626–30.) Jahoda's testimony is confirmed by telephone records dating back to 1983. (Joint Group Ex. 46 & 47.) Following Infelise's 1992 conviction under the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, the jury returned a special forfeiture verdict finding, among other things, that Infelise's interest in 1535 North Forest was subject to forfeiture to the United States pursuant to 18 U.S.C. § 1963(a)(2).

On July 23, 1992, Ann filed a Petition for Remission and Mitigation of Forfeiture pursuant to 18 U.S.C. § 1963(l). In her petition, Ann claimed that she was entitled to the full interest in 1535 North Forest Avenue as a result of the 1983 quitclaim. In later briefs, she argued that the government could not apply the "relation back" doctrine of 18 U.S.C. § 1963(c) to seize the property because the doctrine, passed into law in 1984, could not be applied retroactively to acts that occurred prior to that year. The government claims that the 1983 quitclaim was a sham designed to thwart impending forfeiture efforts. The government also maintains that the relation back doctrine is indeed retroactive, and that it renders the quitclaim void because interest in the property had vested in the United States before February 1983, by which time RICO activity had already occurred on the property. For the reasons stated below, the court agrees with the government, and finds Infelise's interest in the apartment to be forfeitable.

#### 2. Analysis

Under 18 U.S.C. § 1963, the government may seek forfeiture of certain property belonging to an individual who violates 18 U.S.C. § 1962. Section 1963(a) describes the three general categories of forfeitable property interests: (1) those "acquired or main-

tained in violation of Section 1962;" (2) those "affording a source of influence over any enterprise" operated in violation of Section 1962; and (3) those "constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of Section 1962."

Under the "relation back" doctrine of 18 U.S.C. § 1963(c), the government's interest in a convicted RICO defendant's property vests at the time of the commission of acts that give rise to the forfeiture. If a defendant transfers the property after the commission of the acts, the government's interest in the property remains paramount unless the transferee can show, by a preponderance of the evidence, either that: (A) her interests and rights in the property were superior to the defendant's at the time of the commission of the acts; or (B) she was a bona fide purchaser for value who was reasonably without cause to believe that the property was subject to forfeiture. 18 U.S.C. § 1963(*l*)(6).

■ Congress enacted the relation back doctrine of 1963(c) as part of the Comprehensive Crime Control Act of 1984. The amendment did not add to the existing reach of RICO forfeiture provisions. Instead, it clarified existing definitions of forfeitable property and was consistent with the legislative intent behind the original passage of RICO. In other words, the relation back doctrine was already a component of RICO. *United States v. Ginsburg*, 773 F.2d 798, 803 (7th Cir.1985) (en banc), *cert. denied*, 475 U.S. 1011, 106 S.Ct. 1186, 89 L.Ed.2d 302 (1986);

*United States v. Delco Wire and Cable Co.*, 772 F.Supp. 1511, 1515 (E.D.Pa.1991); *United States v. Rogers*, 602 F.Supp. 1332, 1342 (D.Colo.1985), *aff'd*, 960 F.2d 1501 (1992), *cert. denied*, 506 U.S. 1035, 113 S.Ct. 817, 121 L.Ed.2d 689 (1992).

■ In the Seventh Circuit, the fact that the 1984 relation back amendment added nothing to the government's pre-existing forfeiture powers and was consistent with previous congressional intent was not recognized until *Ginsburg*. In that case, the Court of Appeals definitively rejected the notion that Congress ever intended to prohibit the relation back doctrine and limit RICO forfeiture to assets held by a defendant at the time of conviction. *Ginsburg*, 773 F.2d at 802. The court found that the 1984 enactment of 1963(c) supported this conclusion and was consistent with the underlying crime-prevention goals of RICO forfeiture: "[W]e believe that the 1984 amendments merely confirm the already clearly-established legislative intent behind RICO's forfeiture provision, which was to aid, rather than impede, the government's efforts to punish and deter racketeering activity by removing the profit from organized crime. *Id.* at 803." [7] In its *Ginsburg* decision, the Seventh Circuit overruled previous cases such as *United States v. McManigal*, 708 F.2d 276 (7th Cir.1983), *judgment vacated*, 464 U.S. 979, 104 S.Ct. 419, 78 L.Ed.2d 355 (1983), which it found had misinterpreted legislative intent and limited forfeiture to assets held at conviction. *Id.* at 802.[8]

7. The court in *Ginsburg* was primarily concerned with interpreting the legislative intent behind the enactment of 1963(a)(1), the subsection that (at the time) allowed forfeiture of RICO profits and proceeds. The case at hand involves forfeiture of property found to have afforded "a source of influence over" the RICO enterprise, under a different subsection, 1963(a)(2). The case falls under this subsection because the property at issue was not necessarily obtained as a proceed from RICO activity, but was used as a base in connection with RICO activity. The court finds, nevertheless, that the *Ginsburg* court's interpretation of 1963(a)(1) can be applied with equal force to 1963(a)(2). There is no indication that Congress intended 1963(a)(2) property to be any less forfeitable than 1963(a)(1) property. *Rogers*,

602 F.Supp. at 1342. Thus it is appropriate to find that government interest in 1963(a)(2) property also vests at the time of the RICO activity, and is not limited to property still available at conviction.

8. Even the *McManigal* decision left some room for the government to prevent sham transfers obviously designed to thwart forfeiture efforts. While concluding that a RICO defendant could divest himself of RICO-related property prior to conviction, the *McManigal* court qualified its holding: "Of course the government should be given the opportunity to show that the transfer was not to an innocent purchaser." *McManigal*, 708 F.2d at 289 n. 7.

Given that the 1984 enactment of 1963(c) served merely to clarify existing law, the court rejects Ann's contention that the provision cannot be applied retroactively to seize property for activity that occurred in 1981 and 1982. Indeed, the inquiry into retroactivity is arguably unnecessary because (as explained above) the essential components of 1963(c) predated the formal enactment of the provision. Consequently, 1963(c) is fully applicable to the 1535 North Forest Avenue property, and the government's interest in Infelise's share of the property vested by 1982, after acts giving rise to the forfeiture occurred there. The 1983 quitclaim is therefore void, because by 1983 Infelise had no interest in the property to transfer. Ann has thus failed to prove under 1963($l$)(6)(A) that her interest in the disputed property was superior to that of her husband.

Likewise, Ann has failed to satisfy the other possible avenue through which a third party transferee can challenge a forfeiture order: she has not proven that she was a bona fide purchaser for value of the property pursuant to 1963($l$)(6)(B). Ann offers no evidence that Infelise received anything of value in exchange for executing the 1983 quitclaim. Consequently, Ann cannot be deemed a bona fide purchaser of the property in 1983 and thus is unable to invoke 1963($l$)(6)(B). *United States v. Lavin,* 942 F.2d 177, 188 (3rd Cir.1991).

Ann has not met her burden under 1963($l$)(6) to prove by a preponderance of the evidence that she had a superior interest in Infelise's share of the property or that she was a bona fide purchaser of the property. Accordingly, the court rejects Ann's petition and orders the forfeiture to the United States of Infelise's one-half interest in 1535 North Forest Avenue.

**B. *818 South Seventh Avenue, Hollywood, Florida***

**1. Background**

On February 2, 1989, Mr. and Mrs. James D'Alessio conveyed title to property at 818 South Seventh Avenue, Hollywood, Florida by warranty deed to Marie Capezio ("Capezio"), Infelise's mother-in-law. (Omnibus Factual Stipulations ¶ 115.) In two recorded conversations between Jahoda and Infelise in August and October of 1989, Infelise told Jahoda that he bought the Florida house and paid for subsequent repairs with more than $700,000 and that he used his mother-in-law and wife as straw owners to hide his own assets. (Joint Group Ex. 8–G & 8–H.) Infelise described to Jahoda how he provided Capezio with cash to pay for the house. (*Id.*) Infelise also explained that he would get away with such a scheme because Capezio was an elderly woman and the government would not want to invest the time to prove a sham transfer or "bring an 87–year old woman to court." (*Id.*) Jahoda and Infelise discussed what would happen to the property upon the death of Capezio:

> INFELISE: But now. Yeah. She put it in a trust. Annie is executor of the trust. In the will it goes to Annie, nothing to me.
>
> JAHODA: Mmm. Hmm. That's the best that's the best way anyhow. It double washes it.
>
> INFELISE: Fuck them in their ass.
>
> JAHODA: Sure. Absolutely.

(*Id.*) Infelise also admitted to Jahoda how much of his own money he had poured into the property: "I put over 700 in this fucking house in Florida. That's where most of my money went." (*Id.*) On January 24, 1990, title on the property was conveyed from Capezio to Ann M. Infelise and Capezio as joint tenants with right of survivorship. (Joint Group Ex. No. 8–D.) On January 22, 1992, Capezio died, and title in the property passed to Ann. (Omnibus Factual Stipulations ¶ 142.)

Following Infelise's 1992 RICO conviction, the government sought forfeiture of the Florida house as a substitute asset in partial satisfaction of the $3,000,000 in RICO proceeds ordered forfeited to the United States from Infelise and his co-defendant Salvatore DeLaurentis. On August 21, 1992, Infelise, presumably on behalf of his wife, filed a response to the government's motion for an order of forfeiture. Infelise argued that the Florida house could not be seized as a substitute asset because only assets held in the name of a RICO defendant at the time of

conviction can be so forfeited.[9] In response, the government characterizes the purchase of the house by Capezio as an attempt by Infelise to keep his assets out of the reach of government forfeiture. Because Capezio was (and Ann now is) merely a nominal owner of the house, the government contends, the house is an asset of Infelise and is therefore forfeitable as a substitute asset. For the reasons set forth below, the court agrees with the government.

## 2. Analysis

■ Under 18 U.S.C. § 1963(m), if property ordered forfeited upon a RICO conviction cannot be located or is otherwise unavailable, the government may seek forfeiture of any other property of the defendant as substitute assets up to the value of the unavailable forfeited property. *United States v. Reed*, 924 F.2d 1014, 1016 (11th Cir.1991); *United States v. Martenson*, 780 F.Supp. 492, 495 (N.D.Ill.1991). If the government seeks substitute assets that have been transferred from the defendant to a third party, the government is entitled to those assets unless, under 18 U.S.C. § 1963(c), the third party can establish status as "a bona fide purchaser for value who at the time of purchase of the property was reasonably without cause to believe that the property was subject to forfeiture under this section." *In re Assets of Billman*, 915 F.2d 916, 920 (4th Cir.1990). Courts generally do not recognize claims made by third parties who possess title to property but, the evidence shows, do so only as nominal or straw owners on behalf of a defendant attempting to avoid fine or forfeiture. *United States v. Granado*, 72 F.3d 1287, 1294 (7th Cir.1995); *United States v. Herrero*, 893 F.2d 1512, 1542 (7th Cir.1990), *cert. denied*, 496 U.S. 927, 110 S.Ct. 2623, 110 L.Ed.2d 644 (1990).

■ The evidence unambiguously shows that Infelise provided the money for the purchase of the house by Capezio in 1989 in order to conceal his own tainted assets from government forfeiture. The recordings made by Jahoda speak for themselves, and undermine any claim Ann has to the property. Infelise is on tape bragging about having poured his money into the Florida residence and gloating over how hard it would be for the government to connect him to the house. Infelise and Ann offer nothing of substance (beyond pointing to the name on the title) to counter the devastating weight of Infelise's admissions on tape; nor does Ann offer anything to prove that she or Capezio were bona fide purchasers for value of the property as required under 18 U.S.C. § 1963(c). In sum, the evidence proves that Ann and Capezio were merely straw owners of the Florida house used by Infelise to conceal his assets and keep them from the reach of government forfeiture efforts. As such, the house was actually the property of Infelise and is forfeitable as a substitute asset.

Having found Infelise to be the true owner of the Hollywood, Florida house, the court orders the property forfeited to the United States pursuant to 18 U.S.C. § 1963(m), in partial satisfaction of the $3,000,000 in proceeds ordered forfeited in 1992.

## C. *Paine Webber Account*

### 1. Background

On August 7, 1985, Infelise received a distribution of $70,000 from three accounts he maintained at Majestic Eagle Investment Company. (Omnibus Factual Stipulations ¶ 61.) On the same day, Infelise opened account number 1128 at Majestic Eagle in the name of Ann M. Infelise and deposited the $70,000 in that account. (*Id.* ¶ 62.) On October 8, 1985, Infelise opened account number 1140 at Majestic Eagle in the name of Ann and deposited $15,000 in that account. (*Id.* ¶ 64.) Ann testified in her December 3, 1993 deposition that she knew little about the source of these funds, and that she transferred nothing of value to her husband in exchange for the deposits. (Joint Group Ex.

---

9. Infelise also claims that the government violated Rule 7(c)(2) of the Federal Rules of Criminal Procedure by not specifically listing property sought now as substitute assets in the indictment. This claim fails because the government met its burden by specifying in the indictment that it sought $3,700,000 in RICO proceeds. This property (reduced by the jury to $3,000,000) is now unavailable and in its place the government seeks substitute assets.

No. 3 at 48–54.) On September 4, 1987, Ann closed her two Majestic Eagle accounts and received a distribution of approximately $85,000. (Omnibus Factual Stipulations ¶ 100.) That same day, Paine Webber account number CG 77022–21 was opened in Ann's name in the amount of $86,052.70. (*Id.* ¶ 101.) As of July 29, 1994, this account (now numbered HB 05165 78) was valued at $111,561.30. (United States Mem. at 22.)

Following Infelise's 1992 RICO conviction, the government sought forfeiture of the full value of the Paine Webber account as a substitute asset in partial satisfaction of the $3,000,000 in RICO proceeds ordered forfeited to the United States from Infelise and his co-defendant Salvatore DeLaurentis. On August 21, 1992, Infelise, presumably on behalf of his wife, filed response to the government's motion for an order of forfeiture. Infelise argued that the funds in the Paine Webber account could not be used as substitute assets because only assets held in the name of a RICO defendant at the time of conviction can be so forfeited. In response, the government labels the deposit of funds in the Majestic Eagle and Paine Webber accounts sham transactions designed by Infelise to keep his assets out of the reach of government forfeiture. Because Ann is merely nominal owner of the funds, the government contends, the funds remain Infelise's and therefore are forfeitable as substitute assets. For the reasons set forth below, the court agrees with the government.

### 2. Analysis

As noted above, under 18 U.S.C. § 1963(m), if property ordered forfeited upon a RICO conviction cannot be located or is otherwise unavailable, the government may seek forfeiture of any other property of the defendant as substitute assets up to the value of the unavailable forfeited property. *United States v. Reed,* 924 F.2d 1014, 1016 (11th Cir.1991); *United States v. Martenson,* 780 F.Supp. 492, 495 (N.D.Ill.1991).[10]

■ The evidence in the case at hand shows that the establishment of the Majestic Eagle and Paine Webber accounts in Ann's name was a sham designed to avoid forfeiture and that Infelise remained the true owner of the assets. In her deposition, Ann not only failed to explain why Infelise placed the funds in her name, but also admitted not recalling ever being told of the existence of the accounts at the time they were opened. (Joint Group Ex. No. 3 at 48–54.) Moreover, by the time the first Majestic Eagle account was opened in Ann's name in 1985, a federal grand jury was investigating the gambling operation of Infelise and his associates, giving Infelise substantial motive to transfer assets out of accounts in his own name. (Omnibus Factual Stipulations ¶ 53.) Infelise was also recorded numerous times discussing ways to hide assets and property in the names of family members to avoid government forfeiture. (*Id.* ¶¶ 119–A & 127–B, C.)

Ann's claim to the funds in the Paine Webber account is further undermined by the fact that she gave Infelise nothing of value in return for the $85,000 he deposited in Ann's name. Ann thus fails to prove she was a bona fide purchaser of the assets under 18 U.S.C. § 1963(c). *United States v. Lavin,* 942 F.2d 177, 188 (3rd Cir.1991). As such, the court finds that Ann was nothing more than a straw owner and the funds remained the property of Infelise.

Given the sham nature of the Majestic Eagle and Paine Webber accounts, the assets which remain in the Paine Webber account are fully forfeitable as substitute assets pursuant to 18 U.S.C. § 1963(m). Therefore, the court orders that the funds in this account be forfeited to the United States in partial satisfaction of the $3,000,000 in proceeds ordered forfeited in 1992.

### D. *Equitable Life Annuity IRA*

### 1. Background

On February 13, 1986, Infelise opened an Individual Retirement Annuity account ("IRA") at the Equitable Life Assurance Society with an initial deposit of $73,754.74. (Joint Group Ex. No. 7.) As of December 31,

---

**10.** Both *Reed* and *Martenson* held that retroactive application of 18 U.S.C. § 1963(m) did not violate the ex post facto clause of the U.S. Constitution.

1993, the account contained $134,228.58. (United States Mem. at 23.)

Following Infelise's 1992 RICO conviction, the United States moved for forfeiture of the full value of this account as substitute assets in partial satisfaction of the $3,000,000 in RICO proceeds ordered forfeited upon conviction from Infelise and his co-defendant DeLaurentis.

On August 21, 1992, Infelise filed a motion in response to the government's motion for an order of forfeiture. Infelise claimed that his IRA was immune from forfeiture in light of provisions deeming such accounts nonforfeitable in the statute governing his IRA and in the Employee Retirement Income Security Act ("ERISA"). The government contends that Infelise's IRA is not covered by ERISA and is not protected from criminal forfeiture by the IRA statute. For the reasons stated below, the court denies the government's motion for forfeiture.

### 2. Analysis

■ If the language on the face of a statute is clear and unambiguous, courts will not look to legislative history to determine the intent of Congress. *E.g., Barnhill v. Johnson,* 503 U.S. 393, 401, 112 S.Ct. 1386, 1391, 118 L.Ed.2d 39 (1992) ("[A]ppeals to statutory history are well taken only to resolve 'statutory ambiguity.'") (citation omitted); *In re McFarland,* 84 F.3d 943, 947 (7th Cir.1996) ("[T]here is no need to examine legislative history where the words of a statute are clear.") (citations omitted).

■ Infelise's IRA is governed by 26 U.S.C. § 408, which unambiguously precludes forfeiture: "The entire interest of the owner is nonforfeitable." 26 U.S.C. § 408(b)(4). The government argues that Congress intended the word "nonforfeitable" to refer primarily to forfeiture attempts by fund administrators and employers. However, nothing in the plain statutory language indicates that an exception should be made for criminal forfeiture. Given such clear statutory language, the court is unwilling to

probe into legislative history, and finds that use of the word "nonforfeitable" in § 408(b)(4) unambiguously precludes all forfeiture, including criminal forfeiture under RICO.

It is true that none of the few cases to interpret the statute's nonforfeitability provision mention a prohibition on criminal forfeiture,[11] but—by the same token—the government fails to cite even one case in which a court has allowed criminal forfeiture of an IRA despite the language of § 408(b)(4). The court will not rule contrary to unambiguous statutory language and, accordingly, denies the government's motion for forfeiture of Infelise's IRA.[12]

The court denies the motion of the government for forfeiture to the United States of Infelise's Equitable Life Assurance Society IRA as a substitute asset pursuant to 18 U.S.C. § 1963(m). The court orders the immediate release of the full balance of the account to Infelise.

### E. *Midwest Bank & Trust Company Account*

At the time of his indictment, Infelise owned a one-half interest in JEP Leasing, a truck leasing firm. (Joint Group Ex. No. 12.) Following his conviction, the court approved the sale of Infelise's interest in JEP to his wife for $60,000, in order to provide her with an income. At the agreement of the parties, the $60,000 was placed in account number 302853206 at Midwest Bank and Trust to be used to satisfy any order of forfeiture against Infelise. Accordingly, the government has moved for forfeiture of the account as a substitute asset in partial satisfaction of the $3,000,000 in RICO assets ordered forfeited to the United States from Infelise and his co-defendant DeLaurentis. The court approves and orders the forfeiture to the United States of the entirety of the Midwest Bank and Trust account as a substitute asset pursuant to 18 U.S.C. § 1963(m).

---

11. *E.g. In re Damast,* 136 B.R. 11, 14 (D.N.H. 1991); *In re Dunn,* 5 B.R. 156, 158 (N.D.Tex. 1980).

12. Given the court's conclusion, there is no need to determine the viability of Infelise's ERISA argument.

### F. *Mid–America Federal Savings Account*

■ Infelise and his wife jointly hold savings account number 110223448 at Mid–America Federal Savings. Infelise admits that the account is his asset, used primarily to pay real estate taxes on the 1535 North Forest Avenue property. (Infelise Resp. at 7.) Moreover, Ann Infelise conceded in her deposition that all the money in the account came from her husband. (Joint Ex. No. 3 at 54–57.) The government has moved for forfeiture of the account as a substitute asset. Accordingly, the court orders forfeiture of the entirety of the Mid–America Federal Savings account to the United States as a substitute asset pursuant to 18 U.S.C. § 1963(m) in partial satisfaction of the $3,000,000 ordered forfeited from Infelise and his co-defendant DeLaurentis.

### G. *Safe Deposit Box Contents*

Infelise and his wife hold safe deposit box number 6202 at River Forest Bank in River Forest, Illinois. The box contains jewelry and 20 gold coins. (Joint Group Ex. No 3–J and 4.) The parties have resolved all disputes over the contents. Infelise and his wife concede that one ring (a 14k yellow gold cluster diamond ring) and the coins belong to Infelise. (Infelise Mem. at 7.) The government concedes that the rest of the jewelry belongs to Ann Infelise. (United States Mem. at 20.) The government has moved for forfeiture of the ring and the coins as substitute assets. Accordingly, the court orders the ring and the coin forfeited to the United States as substitute assets pursuant to 18 U.S.C. § 1963(m) in partial satisfaction of the $3,000,000 ordered forfeited from Infelise and co-defendant DeLaurentis.

### H. *Seized Currency*

Between 1983 and 1986, law enforcement officers seized various amounts of currency upon the execution of four search warrants carried out during the investigation of Infelise, Salvatore DeLaurentis and other co-defendants. (Omnibus Factual Stipulations ¶¶ 42, 83, 84 & 103.) Although the currency is not, at present, the property of the defendants, the government does not oppose crediting Infelise and DeLaurentis with the total amount of currency seized ($175,974.18) in partial satisfaction of the $3,000,000 ordered forfeited from the two of them to the United States. Accordingly, the court orders forfeiture to the United States of the entirety of this currency pursuant to 18 U.S.C. § 1963(m) in partial satisfaction of the $3,000,000 forfeiture.

### I. *Summary*

In sum, the court orders forfeiture to the United States of Infelise's one-half interest in the River Forest property, the entirety of the Florida property, the Paine Webber account, the Midwest Bank & Trust account, the Mid–America Federal Savings account, one ring and the coins in the River Forest Bank safe deposit box, and the seized United States currency. The court denies the government's motion for forfeiture of Infelise's Equitable Life IRA and orders its immediate release.

### *Conclusion*

For reasons set forth above, the court:

(a) denies the Petition to Amend the Order of Forfeiture to Provide for the Interests of Innocent Third Parties filed by Jerry DeLaurentis, Victoria DeLaurentis, Donna M. DeLaurentis, Vickie Belleno, Gina DeLaurentis Johnson, Salvatore A. DeLaurentis, Jr., Vincent C. DeLaurentis and Gianna Marie DeLaurentis.

(b) denies the Motion for Release of Restrained Assets filed by Donna M. DeLaurentis and Gianna Marie DeLaurentis.

(c) denies the Petition for Remission or Mitigation of Forfeiture filed by Ann Infelise.

(d) grants in part and denies in part the Motion for Forfeiture of Assets Pursuant to 18 U.S.C. § 1963(m) filed by the United States.

In keeping with these rulings, the court orders the release to Rocco E. Infelise of his Individual Retirement Annuity account at the Equitable Life Assurance Society. The court orders the forfeiture to the United States of

the following items for disposition in accordance with the law:

(1) Salvatore DeLaurentis' one-half interest in 411 Lauder Lane, Inverness, Illinois, currently being held in the form of a "substitute res" deposited in the Seized Assets Fund of the United States Marshals Service.

(2) The real property located at 103 East State Road, Island Lake, Illinois.

(3) The entirety of checking account number 0000272876 at the State Bank of Lake Zurich, Lake Zurich, Illinois held in the name of Salvatore DeLaurentis.

(4) Rocco Infelise's one-half interest in the real property located at 1535 North Forest Avenue, Apt. 202, River Forest Illinois.

(5) The real property located at 818 South Florida Avenue, Hollywood, FL held by Ann Infelise.

(6) The entirety of Paine Webber, Inc., brokerage account number HB 05165 78 (formerly # CG 77022–21), held in the name of Ann Infelise.

(7) The entirety of Midwest Bank & Trust account number 302853206, containing Rocco Infelise's one-half interest in J.E.P. Leasing.

(8) The entirety of savings Account number 110223448 at Mid–America Federal Savings, held in the names of Rocco and Ann Infelise.

(9) One 14k yellow gold cluster diamond ring and twenty 1982 Canadian Maple Leaf $50 coins held in safe deposit box 6202 at the River Forest Bank, River Forest, Illinois in the names of Rocco and Ann Infelise.

(10) United States currency totalling $175,974.18 seized by law enforcement officers during searches conducted on November 13, 1983 ($16,877 seized) and December 3, 1986 ($128,315; $3171; and $2000 seized in separate searches).